IN THE MATTER OF THE ESTATE OF BESS I. COX, Deceased. RUTH WILLIFORD, ARDITH ROYER, DOROTHY EVELEIGH, and LOLA GALLAGHER, Plaintiffs and Appellants, v. JOHN C. CANTWELL, ROGER L. CANTWELL, and DAVID LYLE COX, Defendants and Respondents.

No. 10430

Submitted November 14, 1962. Decided April 12, 1963.

380 P.2d 584.

James H. Morrow, Jr. (argued), G. Page Wellcome (argued), Bozeman, for appellants.

Ben E. Berg, Jr. (argued), Charles Angel, Bozeman, for respondents.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This is an appeal by petitioners from an adverse ruling by the district court of the sixth judicial district, County of Park, sitting in probate without a jury. This matter came to a hearing by the filing of a petition to ascertain and declare rights and interests in the Estate of Bess I. Cox, and to determine to whom distribution thereof should be made. This petition was filed by the heirs of Jess A. Cox.

Petitioners-appellants, hereinafter known as petitioners, are the children by a prior marriage of Jess A. Cox, except David Cox who is a child of Bess and Jess Cox. Respondents are the executor and heirs at law of the estate of Bess I. Cox.

A summary of the facts brought out in the hearing in the district court are as follows:

On the morning of June 5, 1960, there was living in the Cox home, Bess and Jess Cox, Mrs. Joe Edwards, a sister of Mrs. Cox, and Mrs. Sarah McCullough, the 78 year old invalid mother of Bess Cox. The home was a two-story house, with a basement apartment, and a utility room in the basement. All the family bedrooms were on the second floor. Mrs. Edwards testified that prior to getting up on the morning of June 5th she heard her sister come upstairs and go into her bedroom and then go downstairs. Shortly after that she heard Jess Cox come upstairs, go into his bedroom, and then go downstairs. She estimated the time between 5:30 a.m. and 6:30 a.m. Shortly after their going downstairs she heard two thuds or noises like the backfiring of an automobile, and that the noises were about two minutes apart. She got up about 7:30 a.m. and went downstairs to the kitchen where she had a cup of coffee. Seeing a light on in the basement she went part way downstairs when she saw her sister lying on the floor in a pool of blood. She immediately called the Livingston Police Department.

Testimony of the coroner, the police, the sheriff, and Mr. Yardley, the county attorney, showed that they all arrived shortly after eight o'clock, and that they carried out a careful investigation of the two deaths. Pictures were taken, physical examinations were made, and the gun and shells were examined. From their investigation it was concluded by all parties in the investigation that Bess Cox had been shot from behind by a Winchester Model 95, Pump 12 gauge shotgun fired by her husband Jess. Lying alongside Bess's body was an empty 12 gauge shell. The body of Jess Cox was in another room a short distance from that of his wife. The physical evidence with regard to Jess Cox indicated that he had discharged the shotgun into his head and exhibits of the ceiling above where his body lay indicated that pellets from the shell went into the ceiling. The shotgun with an empty unextracted shell lay alongside Jess. A door leading out of the basement was

found to be locked with the key in the door. The evidence indicated that Bess was headed for this door at the time she was shot for there were pellets outlining her body in the door.

Prior to her death, Bess had consulted an attorney and papers were drawn, although not yet filed, for a divorce from Jess on the grounds of mental cruelty.

The realty in question was owned jointly by Jess and Bess Cox. Respondents listed an undivided one-half interest in the property as an asset of the estate of Bess. Petitioners sought to have the entire realty declared to be the property of the estate of Jess A. Cox.

The district court found that Jess had unlawfully and feloniously killed Bess I. Cox, and that he therefore became an involuntary trustee of her share of the property for the benefit of the heirs of Bess. Petitioners appealed from the ruling.

The issues raised in this appeal are whether the district court had jurisdiction to rule that Jess had feloniously killed Bess, and if so, whether the court erred in holding that Jess had held the interests of Bess in an involuntary trust for the benefit of the heirs of Bess. The latter question is one of first impression in this jurisdiction.

Since title to the joint interest which Jess held was not brought into issue by the pleadings, this appeal is concerned solely with the undivided interest held by Bess during her lifetime.

With regard to petitioners' claim that the probate court did not have jurisdiction to rule that Jess had feloniously killed Bess, we cannot agree.

The rule has been well-settled in Montana that a probate court's jurisdiction is limited by statute *with regard to probate matters,* but since it is a court of general jurisdiction, in a determination of heirship, it may rule on any issue raised that falls within its original jurisdiction at law or equity. See In re Baxter's Estate, 101 Mont. 504, 54 P.2d 869; Daly Bank v. State, 132 Mont. 387, 318 P.2d 230. The foregoing

cases were decided upon an interpretation of section 91-3801, R.C.M.1947, which reads in part:

"\* \* \* the court or judge shall thereupon acquire jurisdiction to ascertain and determine the heirship, ownership, and interest of all parties in and to the property of said deceased, and such determination shall be final and conclusive in the administration of said estate, and of the title and ownership of said property \* \* \*."

It is to be pointed out that the determination that Jess feloniously killed Bess is not a criminal determination, but is solely restricted to the issue of right to acquire the joint interest of Bess. If such a finding were made in an instance where the one party survived, it could not be construed as a substitute for a criminal action. We therefore hold that the court had jurisdiction to rule in the instant case that Jess had feloniously killed Bess.

Petitioners urge that the real property statute, section 67-310, R.C.M.1947, be strictly applied to any joint tenancy title; that therefore Jess became the sole owner of the property held jointly at the instant he killed his wife. The petitioner thus argues against the weight of the authority at the present time, and against the modern view.

The decisive fact in the case at bar is the voluntary, unlawful and felonious killing of one joint tenant by another as distinguished from an unintentional killing. From all the evidence it appears that Jess Cox shot his wife causing her immediate death before killing himself. This controlling fact cannot possibly be disregarded in a just determination of the case. Conversely, there would seem to be no justification whatsoever for disposing of the case as though Bess died of a natural cause, for no amount of speculation can dissolve the crucial distinction in circumstances.

The general subject of acquisition of property by one who has feloniously killed the owner has been extensively treated

in 4 Scott on Trusts (2d ed.) 1956, Chapter 13, entitled "Constructive Trusts", and particularly §§ 492, 493, and 494.

There is a conflict of authority, in the absence of a statute, in those cases where property is acquired by will or intestate succession by the felonious legatee or heir, but, most jurisdictions apply the constructive trust theory. Under the constructive trust theory, the person committing the homicide who attempts to acquire title to property by virtue of his crime takes the property under a constructive trust.

Scott on Trusts, supra, p. 3181, reads as follows:

"Where the Statute of Wills and the statute of distributions make no provision as to the effect of murder of the decedent by the legatee or heir, the property passes under the will or by intestacy to him. It is then that the equitable principle as to unjust enrichment becomes applicable. That principle is as applicable where the title to property is acquired by murder as it is where the title is acquired by fraud, duress or by undue influence. By imposing a constructive trust upon the murderer, the court is not making an exception to the provisions of the statutes, but is merely compelling the murderer to surrender the profits of his crime and thus preventing his unjust enrichment."

The statute dealing with property held jointly is no more sacred than the statutes dealing with intestate succession, thus, where justice demands a different result, equity will step in.

A corollary situation is presented where property is held by the entirety. Speaking of that situation the Indiana court in National City Bank of Evansville v. Bledsoe, 237 Ind. 130, 138, 144 N.E.2d 710, 714, said:

"Is there any valid reason why the well-settled equitable principle that 'equity will not permit a person to profit by his own wrong at the expense of another,' should not be applicable to an estate by entireties terminated by murder? There is no doubt the murderer in reality has profited from illegally caus-

ing the death of the victim spouse, he has become the sole and exclusive owner of the fee, which he could thereupon alienate or dispose of as he alone saw fit. * * * And while according to the strict common law fiction, the murderer may not have profited or benefited, on the theory that he was, during the marriage, the owner *per tout* of the property, equity looks to the substance and not the form, and should not condone by a common law fiction, the fact that the wrongdoer has actually benefited by his own wrongful conduct."

■ The logic of the Indiana court is no less applicable in the present situation. The equitable doctrine spoken of in the Indiana decision is made a part of our laws by statute. Section 49-109, R.C.M.1947, provides: "No one can take advantage of his own wrong." We therefore hold that the felonous killer cannot take advantage of his own wrong and thereby acquire the deceased's share of the property held jointly.

If we accept the petitioner's view, then we must believe that the Legislature contemplated a situation where a joint owner would feloniously kill the other joint owner, thereby taking all, and approved such a result. We cannot believe that such an abhorrent result was contemplated by the Legislature.

A similar problem faced the Supreme Court of Maryland in Price v. Hitaffer, 164 Md. 505, 508, 514, 516, 165 A. 470, 471, where they said:

"We next approach the question of whether or not section 127 of article 93 of the Code, which prescribes the persons entitled to distribution where a childless wife dies intestate leaving a surviving husband, compels such interpretation as would distribute the portion of the estate therein described to a husband who had murdered his wife. It is argued that, it being once ascertained that the wife died intestate, without children or descendants surviving her, and leaving surviving her husband, we must give effect to the words of the statute and award one-half of the estate to the husband, no

matter how abhorrent to the principles of equity and morality as understood and practiced by the average citizen and almost universally applied by the Christian nations of the world. * * *

''Applying the tests suggested in the above opinion to the present case, we would have now present the members of the Legislature which adopted our statute of descent and distribution, and there would be propounded to them the question: Did you intend to comprehend within the wording of the statute which you passed the case of a husband who murdered his wife, and therefore came within the literal letter of the statute? It is beyond belief that the answer would be in the affirmative. * * * And yet we are here asked to adopt an interpretation of the statute which would enable him, by murder, to enjoy the fruits of his crime, which would be denied him if found to have perpetrated a fraud. * * *

''We are fully cognizant of the existence of high authority contrary to the view which we hold and it would accomplish no beneficial purpose to take them up in detail and review the reasoning therein employed. * * * Suffice it to say that we decline to follow the reasoning supporting any interpretation fraught with consequences so pernicious and so abhorrent to the sense of justice, equity, and morality entertained by what we are pleased to believe is the overwhelming majority of thoughtful and moral people.''

We, too, find it unthinkable that our Legislature contemplated giving the fruits of his crime to one who commits a homicide, and find inherent in the statute dealing with joint property the reservation that the felonious killed shall not benefit by his wrong.

It is argued that the petitioners did not commit the killing, but are the heirs of the one who did the killing. Though this is true, who can say that it was not the intention of the murderer to benefit his heirs when he took the life of his wife followed shortly thereafter by the taking of his own life. If

the logic is persuasive in the first person, it should be nonetheless persuasive when applied to the heirs of the murderer.

We so hold. The decision of the district court is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICE CASTLES concur.

MR. JUSTICE DOYLE, dissenting:

I dissent to the majority opinion for a multitude of reasons.

The first statute that was completely ignored in this cause is section 94-201-1, R.C.M.1947, which reads:

"When a coroner is informed that a person has been killed, or has committed suicide, or has died under such circumstances as to afford a reasonable ground to suspect that his death has been occasioned by the act of another by criminal means, he must go to the place where the body is, cause it to be exhumed if it has been interred, and summon not more than nine persons, qualified by law to serve as jurors, to appear before him, forthwith, at the place where the body of the deceased is, to inquire into the cause of the death."

Although the record discloses that the coroner of Park County was present as were the sheriff and county attorney and the Livingston police, yet the provisions of the above-quoted mandatory statute were not obeyed, but on the contrary much speculative, hearsay evidence was given in the probate hearing which in effect accused and convicted the deceased Jess Cox of the crime of murder in the first degree without any complaint, information or indictment made or filed, and without any credible evidence being presented to establish the oral accusation so made against the dead man.

There are four ways in which this tragedy could have occurred, namely:

(1)  The death of Mr. and Mrs. Cox could have been caused by an intruder; or,

(2)  The death of both could have been an accident; or

(3)  Jess Cox could have been insane, and thus been ren-

dered incapable in the eyes of the law of entertaining the intent to commit murder or any other crime; or

(4) Jess Cox could have shot his wife and then himself. This writer does not suggest any implication on the integrity, honor and ability of my brethren in the majority. I have great respect for their mental honesty and legal ability.

Into every litigated cause there is the patter of the raindrops of error which ofttimes is of sufficient consequence to require a reversal under our laws. I have failed to find in the records of this court any case where there has been such a deluge of rampant error that has been so completely ignored and consigned to oblivion, as is presented in the majority opinion herein.

The majority opinion commences one paragraph in the following language:

"It is to be pointed out that the determination that Jess feloniously killed Bess is not a *criminal determination,* but is solely restricted to the issue of right to acquire the joint interest of Bess." Emphasis supplied.

In the second paragraph following this statement, the opinion states:

"The decisive fact in the case at bar is the voluntary, *unlawful* and *felonious* killing of one joint tenant by another as distinguished by an unintentional killing. From all the evidence it appears that Jess Cox shot his wife causing her immediate death before killing himself." Emphasis supplied.

Despite the protestations and acrobatic semantics that obtain in the majority opinion, it nevertheless tries and convicts in absentia the deceased Jess Cox of first degree murder, and then pronounces upon him this awesome judgment, arrived at by nothing other than hearsay evidence presented in a probate proceeding. Devoid of the protective carapace of the law and the applicable statutes of Montana, this court holds this litigation as a probate question for the determination of heirship. Nothing could be further from factual reality.

The sole question presented is the determination of a joint tenancy under section 67-310, R.C.M.1947, which reads:

"In all conveyances of real property made in joint tenancy or to tenants in estates by entirety, where the right of survivorship is contained in the grant of such conveyance, the right of survivorship is hereby *expressly declared* to exist by virtue of such grant." Emphasis supplied.

The majority opinion turns on a maxim of jurisprudence found in section 49-109, R.C.M.1947, which reads: "No one can take advantage of his own wrong."

The Montana Legislature never enacted a statute which in effect stated that a person who feloniously takes or causes or procures another to take the life of another shall inherit from any such person, or receive any interest whatsoever in the estate if the decedent has a surviving spouse.

This court by this decision usurps the realm reserved for the Legislature. It is apparent, that there being no statute, the devolution of the decedent's estate cannot be accomplished except by the statute, section 67-310, supra. The heir of the joint tenancy could not be denied the right to inherit from his ancestor, even though the latter's death had been caused by the heir's felonious act. The law itself made no exception and it was not the province of this court to read into the law something which it did not and does not contain. Numerous decisions to this effect are based on the ground that the Legislature in directing the course of descent and distribution of estates, has declared the public policy of the state in that respect, and the courts could not alter or affect the policy so determined.

In Thompson on Real Property, 1929 Supplement, Paragraph 1735:

"An estate by entirety is an estate held by the husband and wife by virtue of the title acquired by them jointly after marriage. It is peculiar and anomalous estate, sui generis in character. Estates by entirety have no moieties. *Each owner holds*

*the entirety, each receives per tout et non per my.* Such estates are creatures of the common law created by legal fiction and based wholly on the common law doctrine that the husband and wife are one. And therefore there is but one estate and, in contemplation of law, but one person owning the whole. There can be no severance of the estate by the act of either, and a survivor becomes seized as sole owner of the entirety of the estate. *The estate is not one of inheritance."*

The majority opinion cites National City Bank of Evansville v. Bledsoe, 237 Ind. 130, 144 N.E.2d 710, but the majority opinion fails to state that in that cause it was admitted that on one and the same day, Bynus W. Bledsoe shot and killed his wife Thelma. The majority opinion further fails to mention that the Indiana statute, Acts of 1953, ch. 112, § 212, p. 295 imposing a constructive trust upon one convicted of intentionally causing the death of another, specifically recognizes the pre-existence of equity rules to such effect by stating: "A person * * * convicted * * * shall, *in accordance with the rules of equity,* become a constructive trustee." Emphasis supplied.

The majority opinion also cites a Maryland case, Price v. Hitaffer, 164 Md. 505, 165 A. 470, 471. The first paragraph of this opinion is as follows:

"This appeal is from an order of the Orphans' Court of Baltimore City passed in the distribution of the Estate of Della A. Martin, *deceased intestate,* which order excluded from participation in the distribution of said estate the heirs or personal representatives of Walter J. Martin, the husband of Della A. Martin, *who, it is admitted and proven,* did on the first day of October, 1931, shoot and kill his wife, and almost immediately thereafter commit suicide. These facts present the main question to be determined, namely: Can a murderer, or his heirs and representatives through him, be enriched by taking any portion of the estate of the one murdered?"

It is to be noted that the estate of Della A. Martin was her

estate in its entirety and not a joint tenancy. Further it was admitted and proven that Walter J. Martin killed Della A. Martin which facts are not legally contained in the purview of the transcript in this cause.

The instant appeal was tried to the court sitting in probate under the provisions of section 91-3801, R.C.M.1947. The action should have been brought under section 91-4321, R.C.M.1947, for the termination of life estate or joint tenancy.

This court in Denke v. Wylie, 133 Mont. 424, 435, 324 P.2d 403, 408, held:

"In a special probate proceeding under section 91-4321, supra, a statute for the termination of a life estate, the court below rendered a judgment quieting title to the real property in question. This cannot be done.

"Proceedings to quiet title are set forth in sections 93-6201 to 93-6239, R.C.M.1947. The instant proceeding in no way meets the requirements set forth. To mention but a few, there are neither parties plaintiff nor defendant, no lis pendens, no summons or service thereof. We are aware that by section 93-6239, the statutes on quiet title are cumulative and in addition to any other remedy, but no such remedy exists under section 91-4321, R.C.M.1947, in the termination of a life estate.

"Thus we hold that under the termination of a life estate statute, section 91-4321, supra, in which the statute limits the court to making an order terminating the life estate, the court had no jurisdiction to render certain parts of the judgment as was done herein, nor could the parties confer jurisdiction on the court. In re Spriggs' Estate, supra. [68 Mont. 92, 216 P. 1108]."

This was the language of the Montana Supreme Court on April 10, 1958, and if this reasoning be true, then the lower court in the instant cause was wholly and completely without jurisdiction to make a determination that the deceased, Jess Cox, was guilty of first degree murder.

596

The writer is motivated in this dissent by the Twelfth Century Oath of Maimonides, which is:

"Grant me strength, time and opportunity always to correct what I have acquired, always to extend its domain; for knowledge is immense and the spirit of man can extend infinitely to enrich itself daily with new requirements. Today he can discover his errors of yesterday and tomorrow he may obtain a new light on what he thinks himself sure of today."

MR. JUSTICE ADAIR, dissenting:

Such dissent will be filed later.