George J. SALAK, Administrator of the Estate of Anna Marie Foley, Deceased, Plaintiff,

v.

PROTECTIVE LIFE INSURANCE COMPANY, George Salak, individually, and Alicia Foley, individually, Defendants.

George J. SALAK, Administrator of the Estate of Anna Marie Foley, Deceased, Plaintiff,

v.

The ROYAL MACCABEES LIFE INSURANCE COMPANY, Defendant.

George J. SALAK, Administrator of the Estate of Anna Marie Foley, Deceased, Plaintiff,

v.

The GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, Defendants.

Firstar Bank Iowa, N.A., Administrator of the Estate of Robert Jay Foley, Intervenor.

No. Civ. 4–96–CV–30614.

United States District Court, S.D. Iowa, Central Division.

Sept. 14, 1998.

Robert N. Downer, Meardon Sueppel Downer & Hayes, Iowa City, IA, Kenneth L. Keith, Keith Law Firm PC, Ottumwa, IA, for plaintiffs.

Kenneth R. Munro, Bradshaw Fowler Proctor & Fairgrave, Des Moines, IA, for Royal MacCabees Life Insurance Company, defendant.

Richard G. Langdon, Richard A. Steffen, Herrick Langdon & Langdon, Des Moines, IA, for Guardian Life Insurance Company of America, defendant.

Kirk A. Daily, Webber Gaumer Emanuel & Daily, Ottumwa, IA, for Firstar Bank, cross-defendant.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT AND ORDER FOR JUDGMENT

WALTERS, United States Magistrate Judge.

This matter is before the Court on cross-motions for summary judgment. The action concerns entitlement to life insurance proceeds on policies issued by the defendant insurance companies on the life of Robert Jay Foley. On August 9, 1996, plaintiff filed three separate actions against the insurance companies,[1] alleging entitlement as Administrator of the Estate of Anna Marie Foley to the proceeds of each policy. Firstar Bank, as Administrator of the Estate of Robert Jay Foley intervened in the actions with leave of court. By order dated March 21, 1997, the cases were consolidated.[2] Defendants Protective and Royal Maccabees tendered the policy proceeds into the Court Registry and were discharged as party defendants. The Guardian proceeds were paid to the estate of Robert Jay Foley and Guardian was dismissed from the case by stipulation. Protective interpleaded George Salak and Alicia Champion Foley as party-defendants in their individual capacities. Salak is the father of Anna Foley. Alicia Foley Champion (hereafter "Champion" for ease of reference) is the sister of Robert Jay Foley.

Jurisdiction is predicated on diversity of citizenship. 28 U.S.C. § 1332.[3] The parties consented to proceed before a United States Magistrate Judge and the case was referred to the undersigned for all further proceedings on April 18, 1997. See 28 U.S.C. § 636(c).

Salak, individually, and intervenor Firstar filed cross-motions for summary judgment on January 26, 1998. Salak claims he is entitled to one-half of the proceeds of the Protective policy as contingent beneficiary. Firstar contends all of the proceeds of all of the Protective policy should be paid to the estate of Robert Jay Foley, or alternatively, that Salak's share as contingent beneficiary be paid to the estate with the other half passing to the other contingent beneficiary, Alicia Champion.[4] It also asks for judgment that the Guardian policy be paid to the estate of Robert Jay Foley and the Royal Maccabees policy be paid to Jay Foley, the father of Robert Jay Foley.

### I.

The standards for summary judgment are well known and the Court will not dwell on them at length. Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); see Walsh v. United States, 31 F.3d 696, 698 (8th Cir.1994). While arguably there are some issues of disputed fact in this case, they are not material. The case involves the interpretation of insurance policy language in light of the Iowa "Felonious Death" statute, Iowa Code §§ 633.535–.536, and the effect of a state court adjudication under it. These are legal issues. It follows the case may properly be resolved on the cross-motions.

### II.

The insurance issues in this case are against the backdrop of a senseless tragedy.

1. The cases were numbered 4–96–cv–70614, 4–96–cv–70615 and 4–96–cv–70616.

2. Under the lead case number 4–96–cv–70614, since changed to 30614.

3. The estates are Iowa estates, Salak is a citizen of Iowa, Champion is a citizen of Arizona and the insurance companies are citizens of Alabama, Tennessee, Michigan and New York for diversity purposes. The present contestants, Salak and Firstar, are Iowa citizens, but the Court believes it has supplemental jurisdiction of the claims between them under 28 U.S.C. § 1367(a) which is not precluded by § 1367(b).

4. As a practical matter the interests of Robert's estate and Champion are not opposed. At argument the Court was informed by Firstar's counsel that while Champion had not appeared, he was representing her interests in the matter.

Anna Marie Foley and Robert Jay Foley were husband and wife and lived in Ottumwa, Iowa, where Robert was an emergency room physician at the local hospital. Robert became interested in another woman, the marriage collapsed and on January 16, 1996, Robert filed for divorce. (Firstar Ex. 3). Later the same day Anna shot her husband and then herself. The medical examiner concluded that Anna shot Robert in the back of the head while he was sitting at a desk in one room, then dragged him into the bedroom and shot herself. (Salak Ex. 2 at 2). The parties had no children and died intestate. Robert was 33 years of age.

Anna had apparently planned the murder-suicide. The police found letters written by Anna regarding the impending divorce and Robert's affair. In one, dated January 13, 1996, she gave directions about the disposition of the couple's personal property and noted that her father, George Salak, and Champion were "secondary beneficiaries" under the Protective policy. (Firstar Ex. 4, at 1).

The parties do not agree who died first. The death certificate for Robert lists Anna as "Surviving Spouse." (Firstar Ex. 11). Firstar submitted an affidavit from the medical examiner, Dr. Francis Garrity, explaining that Robert died of a gunshot wound to the head which completely transected the cervical cord causing instantaneous death. (Firstar Ex. 9). In response, Salak points out that in the state court proceedings referenced below, Firstar contended that neither the police investigation nor the autopsy reports established the time of death of either decedent and that Firstar, in responses to requests for admissions, denied Anna survived Robert. (Salak Exs. A and B). Though it seems highly probable from the circumstances that Robert died first, the fact is ultimately not important. As discussed below, by operation of law Anna is deemed to have predeceased her husband for life insurance purposes.

After the murder-suicide estates were opened in the Iowa District Court for Wapello County for both Robert Jay Foley and Anna Marie Foley. Firstar, as administrator of Robert's estate, commenced probate proceedings under the procedures set forth in Iowa Code § 633.536 to deny death benefits to Anna's estate. On September 25, 1997 following a hearing, the district court ruled that Anna "intentionally and unjustifiably caused Robert's death," thus precluding Anna or her estate from inheriting from Robert's estate or receiving proceeds under any insurance on Robert's life. (Salak's Ex. 2; Firstar Ex. 2). No appeal was taken from this ruling. The parties do not dispute this factual finding or its legal effect of disqualifying Anna as an insurance beneficiary. The Estate of Anna Foley has been closed and George Salak released from his duties as Administrator. (Firstar Ex. 10).

At the time of his death, Robert was the insured under three life insurance policies: Guardian Life Insurance Company Policy No. 280045 in the amount of $100,000; Royal Maccabees Life Insurance Policy No. G–22662 in the amount of $300,000; and Protective Life Insurance Company Policy No. PL0535318 in the amount of $500,000 (Firstar Ex. 7). Anna was the primary beneficiary under all three policies. (Firstar Statement ¶ 5). The Guardian and Royal Maccabees policies were group policies with standard beneficiary designations. Under the Guardian policy if there is no beneficiary upon death of the insured, the insurance is paid to the estate. (Firstar Ex. 6). The beneficiaries under the Royal Maccabees policy are the spouse, if living, followed by the children, and next, the surviving parents of the insured. (Firstar Ex. 5). Salak (Anna's father) and Champion (Robert's sister) were designated contingent beneficiaries under the Protective policy, each to take one-half.

The fighting issues concern the Protective policy. There is evidence in the summary judgment record that Anna handled the details surrounding the purchase of the policy, although Robert signed the policy application and was owner. (Firstar Ex. 8). The insurance agent who sold the policy states in an affidavit that "it was most likely that Anna Foley told me who to use as contingent beneficiaries as she was the individual I dealt with on the details ...." (*Id.*). He also says he does not know if the contingent beneficiaries

were named at the time Robert came into the office to sign the application, or were added afterwards. (*Id.*) There is no evidence in the summary judgment record of what passed between Robert and Anna Foley concerning the naming of contingent beneficiaries.

The Protective policy provides as follows concerning the distribution of the proceeds to beneficiaries:

A beneficiary is any person named by you to receive the insurance proceeds after the insured dies. The Beneficiary you named in the application will receive the proceeds unless changed by you. There may be different classes of Beneficiaries such as primary and contingent. These classes set the order of payment. If a primary Beneficiary is not alive at the death of the Insured, we pay the contingent Beneficiary. If you do not name a contingent Beneficiary, or if the contingent Beneficiary is not alive; we pay you, or anyone to whom you have assigned your rights in this policy.

(Firstar Ex. 7 at 5). The application for the policy was signed February 3, 1995. (Firstar Ex. 8).

### III.

The Iowa Felonious Death statute, Iowa Code §§ 633.535–537 (1997), codifies the long established public policy that a murderer may not benefit from his crime. *Schmidt v. Northern Life Ass'n,* 112 Iowa 41, 44–45, 83 N.W. 800, 801 (1900) ("we know of no reason why the maxim 'Nullus commodum capere potest de injuria sua propria' should not apply"); *see Mutual Life Ins. Co. v. Armstrong,* 117 U.S. 591, 600, 6 S.Ct. 877, 29 L.Ed. 997 (1886); *Kascoutas v. Federal Life Ins. Co.,* 193 Iowa 343, 350, 185 N.W. 125, (1921). The statute was not much changed from the original version first codified in the 1897 Iowa Code until it was rewritten in 1987. *Compare* Iowa Code § 3386 (1897) *with* Iowa Code § 633.535–.537 (1989).[5] A person who "feloniously" took the life of another (or caused or procured the death) could not inherit from the decedent or take the proceeds of a life insurance policy on the decedent's life. Instead, the inheritance and insurance proceeds which would have gone to the disqualified person were to be distributed to the decedent's heirs according to the laws of testate or intestate succession.

In 1987 the Iowa legislature eliminated the requirement that the disqualified benefits pass to the decedent's heirs under the probate code, and provided instead (in the case of insurance proceeds) that they would be distributed "as though the person causing death had predeceased the decedent." Iowa Code § 633.535(3) (1987); *see id.* § 535(1) (similarly providing in the case of estate property that such property "shall pass as if the person causing death died before the decedent"). The class of persons disqualified was redefined to deny benefits to those who "intentionally and unjustifiably" cause or procure the death of another, and the new statute adopted a procedure to determine whether a person should be disqualified for this reason. Iowa Code § 633.535(1)–(3), 633.536 (1987).

On the face of it, how the revised statute would operate here seems clear. In the case of the Protective policy, Anna has been disqualified as the primary beneficiary by the judgment of the Iowa District Court because she "intentionally and unjustifiably" took Robert's life. The proceeds are therefore payable as if Anna had died first. Under the terms of the Protective policy, this means the contingent beneficiaries, Salak and Champion, take in equal shares.

■■■ Firstar objects to this result for two related reasons. First, it argues Anna in fact survived Robert and the Protective policy does not contemplate disqualification by law. The policy states the proceeds are paid to the contingent beneficiaries only if the primary beneficiary "is not alive at the death of the insured." Second, to allow Anna's father, Salak, to receive any portion of the proceeds is opposed to the public policy behind the statute and its language proscribing any "benefit" to the person causing death. Anna, Firstar argues, would receive a benefit if her father is paid and to avoid this the statute should be construed to also disqualify

---

**5.** The 1987 changes were first codified in the 1989 Iowa Code.

"persons directly related to the murderer." Firstar's Argument at 5.

Firstar's policy language argument is not convincing because it is contrary to the plain language of § 633. 535(3). If Anna did not predecease Robert as a matter of fact, she did as a matter of law. It is well established the law is incorporated into the policy the same as if it had been written into it. *In re Estate of Brown,* 205 N.W.2d 925, 927 (Iowa 1973); 12 Appleman, *Insurance Law and Practice* § 7041 at 166 (West 1981). In fact, the preferred rule even without a statutory presumption has been that the slayer beneficiary is treated as having pre-deceased the insured. *United Presidential Life Ins. Co. v. Moss,* 838 P.2d 1011, 1014 (Okla.App.1992) (citing R. Keeton, *Basic Text on Insurance Law* § 4.11(g)(3) (1971)); *see Lewis v. Lewis,* 281 S.C. 388, 389–91, 315 S.E.2d 816, 817 (1984); *see also Webb v. Voirol,* 773 F.2d 208, 212 (8th Cir.1985) (recognizing the majority rule, but deferring to the district court's interpretation of state law; slayer statute not involved).

Ultimately Firstar's public policy argument is also unconvincing. The Felonious Death statute [6] addresses the distribution of insurance benefits where the primary beneficiary is disqualified. Where the legislature has spoken, the legislature, not the Court, declares public policy. *State v. Henneberry,* 558 N.W.2d 708, 710 (Iowa 1997). The preamble to the 1987 enactment states it is an Act "to prohibit a person who intentionally and unjustifiably causes or procures the death of another from receiving any property, benefit, or other interest by reason of the death." 1987 Iowa Acts H.F. 168. Textually the statute disqualifies only the "named beneficiary" of an insurance policy who intentionally and unjustifiably causes the death from receiving any benefit "under the ... policy...." Iowa Code § 633.535(3). The only relevant benefit under Protective's policy is the death benefit. If the legislature had wanted to also disqualify innocent beneficiaries solely because of their relationship to the person who caused death, it could have so

provided, but it did not. "[L]egislative intent is expressed by omission as well as by inclusion. Stated otherwise, the express mention of one thing implies the exclusion of others." *Estate of Wilson,* 202 N.W.2d 41, 44 (Iowa 1972). The legislature must have known that in cases of domestic murder-suicide the last to die is usually the party who commits suicide and often a primary beneficiary of the insured victim, and that the effect of the 1987 changes would be to pass the benefits on to any designated contingent beneficiaries without limitation whereas before they would have passed under the victim's will or by intestate succession. The Court presumes the legislature acted with a purpose in making the 1987 changes. *Jenney v. Iowa Dist. Ct.,* 456 N.W.2d 921, 923 (Iowa 1990).

An expansive definition of the statutory term "benefit" to eliminate all subjective advantage the slayer might receive from having his or her relatives receive money or property as a result of the victim's death would be difficult to apply in practice short of the type of per se rule Firstar appears to put forward. The problem with such a rule is that it is premised on the unwarranted assumption that payment to the slayer's relatives always is solely an indirect benefit to the slayer. It is not difficult to think of circumstances in which it would be unreasonable and unfair to disqualify insurance beneficiaries based on their relationship with the slayer, as well as opposed to the express wishes of the decedent insured. Life is not simplistic. People and their reasons for doing things are diverse and not always easy to explain or fathom. What may be an indirect and subjective benefit to the husband or wife who kills a spouse may in the same sense equally benefit the person whose life has been taken and fully in accord with what the victim's wishes would be in the circumstances. It could, for example, just as easily happen in a case like this that the contingent beneficiary is a son of the spouse who committed the murder raised by the deceased as if he were his own son, but never adopted; or is the disabled sister of the spouse who needs full time nursing care and of whom the decedent

---

**6.** It is still so titled in the Code despite the deletion of the "felonious" requirement from the substantive provisions.

was particularly fond; or is the father of the spouse who helped the decedent get his start in business but who is now infirm and needs support. In each of these cases the innocent beneficiary would be disqualified under Firstar's theory solely because the beneficiary was related to the spouse who caused the death. In each, the deceased had an independent reason for designating the contingent beneficiary and, of course, no reason at all is necessary. Perhaps the Iowa legislature recognized the difficulties of a blanket disqualification of relatives of the slayer and decided not to incorporate it in the statute. In any event, nothing in the Iowa Felonious Death statute contemplates or requires the disqualification of a contingent beneficiary to an insurance policy solely because he or she is the relative of the person who took the life of the insured.

 Firstar argues that the naming of Salak as a contingent beneficiary fulfilled Anna's intent, not Robert's. Only speculation supports this conclusion. The policy was purchased while the couple lived in Florida. There is no suggestion the acquisition of the policy was part of a plan to kill Robert a year later.[7] That Anna shopped for the policy because her husband was busy and told the insurance agent who the contingent beneficiaries would be says little about Robert's involvement in the decision or his intent. What Anna and Robert discussed about the policy is not indicated in the record and is perhaps unknowable. Robert was the owner of the policy and had the right to designate beneficiaries. His profession signifies he was educated and intelligent. There is no evidence of duress or undue influence. The only clear expression of Robert's intent is the application which bears his signature designating Salak and Champion as contingent beneficiaries. It is not illogical that without children, he would designate a member of his immediate family and a member of his wife's as contingent beneficiaries.

There is no directly applicable Iowa case law and what there is not much help to Firstar. Firstar relies heavily on the

Schmidt case, but Schmidt only articulated the general common law principle that an insurance beneficiary who murders the insured forfeits his or her rights under the policy. 112 Iowa at 44, 83 N.W. at 801. It is true that Schmidt held a daughter of the murderer was not entitled to recover any portion of the proceeds, but that was only because so long as the murderer lived she had no heirs. 112 Iowa at 43, 83 N.W. at 801. Other Iowa cases have construed the felonious death statute narrowly. *In re Kuhn's Estate*, 125 Iowa 449, 101 N.W. 151 (1904), involved the original version of the statute. The statute prohibited the slayer from taking by devise or legacy from the victim and the question was whether this language also prohibited the slayer wife from receiving her distributive share. The Iowa Supreme Court held she was entitled to take her distributive share because it did not pass by devise or legacy. It reasoned that the statute was penal in nature and should be strictly construed. 125 Iowa at 451–52, 101 N.W. at 151. Later, in *In re Emerson's Estate*, 191 Iowa 900, 183 N.W. 327 (1921), the Iowa Supreme Court was faced with the question whether the statute should be applied to deny the son the benefits under the Will of his father where the son feloniously caused his mother's death. The father had bequeathed a farm to his wife and son jointly as long as they both lived, with the survivor receiving the farm upon the death of the other. Again, the Iowa Supreme Court concluded that the statute was a penal statute which should be strictly construed. 191 Iowa at 906, 183 N.W. at 329. The son was not disqualified from receiving the benefit under his father's Will because the statute only dealt with "inheritance or testamentary devolution from the victim of the crime." *Id.*

The case law from other jurisdictions to which the Court's attention has been directed is mixed and both sides can isolate supportive language. Overall, it does not provide much guidance. Turning first to those cited by Salak, *United Presidential Life Ins. Co. v. Moss, supra*, was a contingent beneficiary

---

7. Where a policy is procured by a beneficiary as part of a plan to murder the insured, the policy is subject to being voided for fraud. 1B Appleman,

*Insurance Law and Practice* § 482 at 314; *see Armstrong*, 117 U.S. at 600, 6 S.Ct. 877.

case involving a "slayer statute" like Iowa's pre–1987 version under which the proceeds were to go to the victim's heirs. The insurance policy contained a beneficiary provision like Protective's which required that the primary beneficiary predecease before contingent beneficiaries could take. 838 P.2d 1011. In holding in favor of the contingent beneficiary, the court concluded the legislature did not intend to "obviate the insured's right to direct who was to benefit from his or her contractual rights." *Id.* at 1014.

In *Lee v. Aylward,* 790 S.W.2d 462, 463 (Mo.1990), the court applied common law principles in addressing the question whether the estate or the contingent beneficiaries, some of whom were the children of the slayer wife, should receive the insurance proceeds. The court found for the contingent beneficiaries and summarily rejected the argument the slayer's children should be disqualified. *Id.* at 463. The court rejected "inappropriate speculation" about what the insured would have intended under the circumstances. In an earlier case from Missouri, *Baker v. Martin,* 709 S.W.2d 533 (Mo.App.1986), the court was faced with the murder of the testatrix by a devisee. The devisee was disqualified and the argument was made that two other devisees, the children of the murderer, should also be disqualified because of their relationship to the murderer. The court rejected such a result as at odds with the Missouri constitutional provision that a criminal conviction not work "corruption of blood or forfeiture of estate." *Id.* at 536.

*Seidlitz v. Eames,* 753 P.2d 775 (Co.App. 1987), involved a slayer statute similar to Iowa's post–1987 version. The husband was murdered by his long-time lover and the wife survived. The slayer owned the policy and designated her estate and her children as contingent beneficiaries and successor owners. The court rejected the argument for a "prohibition against the innocent progeny of a murderer receiving as owners, the proceeds of an insurance policy" in part because they had "no culpability in the murder." [8] *Id.* at 777.

Finally, *Gardner v. Nationwide Life Ins. Co.,* 22 N.C.App. 404, 206 S.E.2d 818 (1974), was a murder-suicide case involving the distribution of the proceeds of a life insurance policy on the life of the *slayer.* Because the wife pre-deceased by being murdered, the insurance company paid the proceeds to the next class of beneficiaries, the slayer's surviving mother. The estate of the wife sued arguing the payment violated the policy behind North Carolina's slayer statute. The court rejected the argument, stating "[t]he public policy sought to be fostered [by the statute] is predicated upon the theory that the murderer Himself will not profit by his own wrongdoing; however, this principle does not extend to those related to the slayer, when, as here, they are named in the insurance contract as alternative beneficiaries." 22 N.C.App. at 409, 206 S.E.2d at 820.

Firstar relies on a number of cases in which there are statements to the effect that the disqualification of the slayer should extend to the slayer's relatives. *See Beck v. Downey,* 198 F.2d 626, 629 (9th Cir.1952) (Fee, J., concurring on remand); *Cory v. Jeffers,* 134 Cal.App.3d 729, 735, 182 Cal. Rptr. 300, 303 (Cal.App.1982); *Matter of Estate of Safran,* 102 Wis.2d 79, 306 N.W.2d 27, 37 (1981); *In re Cox' Estate,* 141 Mont. 583, 590, 380 P.2d 584, 588 (1963); *Meyer v. Johnson,* 115 Cal.App. 646, 650, 2 P.2d 456, 458 (1931). A threshold distinction in each of these cases is the fact that none involved a felonious death or slayer statute. The facts in each case are also significantly different from the present.

On remand in *Beck,* the concurring judge opined that if the murderer could not take directly under the common law, he should not be permitted to benefit indirectly by gift to his family. 198 F.2d at 628. The holding of the case, however, is found in the original opinion at 191 F.2d 150, which was re-adopted on remand. The court held only that the contingent beneficiary did not receive the proceeds because the primary beneficiary, the murderer, was living, and was not to be considered civilly dead by reason of the

---

8. The dissent objected that the slayer's "absolute control over the ultimate disposition of the insurance proceeds" was a "benefit" within the meaning of the statute so as to disqualify the slayer's children. 753 P.2d at 778.

fact he was serving a life sentence in prison. The death of the primary beneficiary was a condition precedent to recovery by the contingent beneficiary. 191 F.2d at 153.

In *Estate of Safran*, the Wisconsin Supreme Court viewed the concurrence in *Beck* as articulating a rule "that persons directly related to the murderer are disqualified with him" but recognized there could be exceptions. The court held that the interests of children of the murderer which were neither born nor conceived were, in any event, too remote to be recognized. 306 N.W.2d at 37.

In *Jeffers* the issue was presented in the context of an inheritance tax dispute. The wife shot and killed her husband. She was the owner of life insurance policies in which the alternative beneficiary was a trust she had established for her children. The court concluded that where the alternate beneficiary was designated by the primary beneficiary who in turn was responsible for the death, allowing the trust to take would give effect to the intent of the murderer, not the insured. 134 Cal.App.3d at 735, 182 Cal.Rptr. at 303.

*Cox* was a murder-suicide case involving the disposition of real property held jointly by the deceased husband and wife. The court concluded that inherent in the Montana statute dealing with joint property was the idea that the felonious killer should not benefit, and did not allow the heirs of the murderer to take in part because the murderer may have intended to benefit them. 141 Mont. at 590, 380 P.2d at 588.

Lastly, in *Meyer* the husband beneficiary murdered his insured wife. The husband was the only beneficiary. The question appears to have been whether the estate of the murderer or the victim should receive the proceeds and the court made the not difficult choice in favor of the victim's estate. 115 Cal.App. at 647, 650, 2 P.2d at 456, 458.

In the Court's judgment the few cases identified by Firstar do not articulate a generally accepted rule that the relative of one who kills an insured is disqualified from receiving benefits the same as the person who committed the murder. Even if there were

such a common law rule, it would be of assistance only if there were no governing statute. Iowa has a statute which in 1987 was changed to provide that insurance benefits from the death of the victim would pass as though the murderer had predeceased the victim without limitation on who could take as contingent beneficiaries. In the final analysis, this Court believes it is doubtful the Iowa Supreme Court would adopt the expansive construction of the Felonious Death statute urged by Firstar. To do so would be at odds with the language of the statute, violate ordinary rules of statutory construction, risk unreasonable consequences, and lack substantial support in Iowa case law or elsewhere. More fundamentally, the result in this case, forfeiture of a contract right solely because of blood relationship with a wrongdoer, would be uncomfortably close to an attainder with consequent corruption of blood which the law everywhere in this country generally disapproves. *See* U.S. Const. art. I, § 9; Iowa Const., art. I, § 9; *In re Emerson's Estate*, 183 N.W. at 329 ("[t]he policy of this state ... is opposed to the imposition of forfeitures and attainders"); *Baker*, 709 S.W.2d at 536.

## IV.

For the foregoing reasons, Firstar's motion for summary judgment with respect to the Protective policy will be denied and that of Salak granted. The Protective insurance proceeds will pass as provided in the contingent beneficiary designation.

There is no dispute with respect to Firstar's motion concerning the Royal Maccabees and Guardian policies. Accordingly, these portions of Firstar's motion will be granted and judgment will be entered that Jay Foley, the father of Robert J. Foley is entitled to receive the proceeds of the Royal Maccabees policy[9] and the Estate of Robert J. Foley the proceeds of the Guardian policy.

This action has developed into an interpleader action and, the proceeds having been deposited with the Court by two of the insurance carriers, the Court will enter a declara-

9. Implicit in the motion papers is that Jay Foley was the sole surviving parent of Robert Jay Foley at the time of the latter's death. This ruling assumes that to be the case.

tory judgment concerning distribution and require counsel to confer with respect to appropriate orders therefor. The judgment ordered below resolves all of the remaining claims in these cases.

### ORDERS

IT IS ORDERED that the motion for summary judgment of intervenor Firstar Bank Iowa, NA is granted in part and denied in part in conformity with the foregoing discussion. The motion for summary judgment of George Salak in the action involving the Protective Life Insurance Company policy is granted;

IT IS FURTHER ORDERED that the Clerk shall enter judgment substantially as follows:

IT IS ORDERED, ADJUDGED AND DECREED in the case of George J. Salak, Administrator v. Protective Life Insurance Company, et al., that George Salak and Alicia Foley f/k/a Alicia Champion are each entitled to receive one-half of the proceeds of the policy issued on the life of Robert Jay Foley;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED in the case George J. Salak, Administrator v. The Royal Maccabees Life Insurance Company that Jay Foley, the father of Robert Jay Foley, is entitled to receive the proceeds of the policy issued on the life of Robert Jay Foley;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED in the case George J. Salak, Administrator v. The Guardian Life Insurance Company of America that the Estate of Robert Jay Foley is entitled to receive the proceeds of the policy issued on the life of Robert Jay Foley.

IT IS FURTHER ORDERED that counsel shall confer and within forty-five (45) days of the date hereof present an agreed order for the disposition of funds deposited in the registry of the Court.

IT IS SO ORDERED.