HARRY L. PRICE, Administrator, *v.* ANNIE C. HITAFFER, Administratrix, et al.

[No. 37, January Term, 1933.]

*Decided April 5th, 1933.*

The cause was argued before Bond, C. J., Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*Parlett Brenton,* with whom was *Harry L. Price* on the brief, for the appellant.

*Charles T. LeViness, 3rd,* and *Hall Hammond,* with whom was *Robert N. Baer* on the brief, for Annie C. Hitaffer, appellee.

Digges, J., delivered the opinion of the Court.

This appeal is from an order of the Orphans' Court of Baltimore City passed in the distribution of the estate of Della A. Martin, deceased intestate, which order excluded from participation in the distribution of said estate the heirs or personal representatives of Walter J. Martin, the husband of Della A. Martin, who, it is admitted and proven, did on the first day of October, 1931, shoot and kill his wife, and almost immediately thereafter commit suicide. These facts present the main question to be determined, namely: Can a murderer, or his heirs and representatives through him, be enriched by taking any portion of the estate of the one murdered?

The case is one of first impression in this state, and at the threshold this court is met with conflicting decisions of other courts of last resort in this country, which divergent views and opposite conclusions have been urged upon us by counsel for the respective parties in able briefs and forceful oral argument. These contentions represent the two views which this court is at liberty to take, each of which has been adopted by other courts, as exemplified and illustrated by the decisions to which our attention has been directed, either by counsel, or as a result of our own investigation. One line of decisions apply the common-law principle of equity that no one shall be permitted to profit by his own fraud, to take advantage of his own wrong, to found any claim upon his own iniquity, or to acquire property by his own crime, and hold that provisions of a will and the statutes of descent and distribution should be interpreted in the light of those universally recognized principles of justice and morality; that such interpretation is justified and compelled by the public policy embraced in those principles or maxims, which must control the interpretation of law, statutes, and contracts. The other and opposite view, as expressed in those decisions which reach a different conclusion, is that, while they recognize the public policy of the common law as declared in the principles and equitable maxims above set forth, such public policy founded upon the common law has been abrogated

and denied, and a new and different public policy declared by the Legislature in the enactment of statutes to direct descents and distribution, or governing the execution and effect of testamentary disposition. Some of the courts in the last mentioned group also rely upon constitutional or statutory declarations to the effect that conviction of crime shall not work a corruption of blood or forfeiture of estate.

In this case, Mrs. Martin having died intestate, the appellant relies upon the language of sections 124 and 127 of article 93 of the Code, which provide: "124. When all debts of an intestate exhibited and proved or notified and not barred shall have been discharged or settled, or allowed to be retained as herein directed, the administrator shall proceed to make distribution of the surplus as follows. 127. If there be a surviving husband or a widow, as the case may be, and no child or descendant of the intestate, but the said intestate shall leave a father or mother, or brother or sister, or child of a brother or sister, the surviving husband or widow, as the case may be, shall have one-half." Mrs. Martin, the wife, was childless at the time of her death, and left surviving her one sister, and four nephews and one niece, the children of two deceased sisters of the intestate. The husband of the intestate survived her. The whole of the intestate's estate consisted of money amounting to $6,365.78, remaining for distribution to her next of kin after all debts and costs of administration had been paid. The appellant is the duly qualified administrator of the husband.

According to the language of the statute above set forth, the facts were such as would have plainly entitled the husband to one-half of the wife's personal estate at the time his wife died with him surviving, and, he being now dead, his administrator would be entitled to the same amount, if the wife had died a natural death and the husband had survived. Does the fact of the criminal act of the husband in killing his wife prevent distribution of the wife's estate in the manner it would be distributed under normal circumstances?

Article 27 of the Declaration of Rights declares "That no conviction shall work corruption of blood or forfeiture of

estate"; and this declaration is also embodied in section 573 of article 27 of the Code, which is: "No conviction or attainder shall work corruption of blood or forfeiture of estate; the estate of such persons as shall destroy their own lives shall descend or vest as in case of natural death; if any person be killed by casualty there shall be no forfeiture in consequence thereof; an approver shall never be admitted in any case whatsoever, and a sentence of death shall not be executed in less than twenty days after judgment."

The contention is that these constitutional and statutory provisions have been violated by the order of the orphans' court. In the view that we take of the case, the constitutional and statutory prohibition against corruption of blood and forfeiture of estate by conviction has no application, because by reason of his murderous act the husband never acquired a beneficial interest in any part of his wife's estate. These provisions apply to the forfeiture of an estate held by the criminal at the time of the commission of the crime, or which he might thereafter become legally or equitably entitled to. In other words, it is a constitutional declaration against forfeiture for a general conviction of crime. *Wellner v. Eckstein,* 105 Minn. 444, 117 N. W. 830; *Perry v. Strawbridge,* 209 Mo. 621, 108 S. W. 641; *Box v. Lanier,* 112 Tenn. 393, 79 S. W. 1042; *Wharton on Homicide* (3rd Ed.), sec. 665. There can be no forfeiture without first having beneficial use or possession. One cannot forfeit what he never had. The surviving husband in the case before us, never having acquired any interest in his wife's estate, there is nothing upon which the constitutional or statutory prohibition can operate. By virtue of his act he is prevented from acquiring property which he would otherwise have acquired, but does not forfeit an estate which he possessed. *In re Tyler's Estate,* 140 Wash. 691, 250 P. 456; *Riggs v. Palmer,* 115 N. Y. 506, 22 N. E. 188.

We next approach the question of whether or not section 127 of article 93 of the Code, which prescribes the persons entitled to distribution where a childless wife dies intestate leaving a surviving husband, compels such interpretation as

would distribute the portion of the estate therein described to a husband who had murdered his wife. It is argued that, it being once ascertained that the wife died intestate, without children or descendants surviving her, and leaving surviving her husband, we must give effect to the words of the statute and award one-half of the estate to the husband, no matter how abhorrent to the principles of equity and morality as understood and practiced by the average citizen, and almost universally applied by the Christian nations of the world. It is further argued that the enactment by the Legislature of our statutes of descent and distribution was a legislative declaration of the public policy of this state, overriding a contrary public policy embodied in the common law as a result of ages of wisdom, morality, and good conscience. In the development of such a public policy there may have been, and doubtless were, individuals who did not agree with or subscribe to such a policy, but the fact that it became a maxim of the common law demonstrates the overpowering force of its righteousness and the settled conviction of men throughout a very long period, derived from experience, observation, and sound thinking, as to its inherent and incontrovertible worth. Speaking of statutes, Blackstone wrote: "If there arises out of them collaterally any absurd consequences, manifestly contradictory to common reason, they are, with regard to those collateral consequences, void. * * * Where some collateral matter arises out of the general words, and happens to be unreasonable; there the judges are in decency to conclude that this consequence was not foreseen by the Parliament, and therefore they are at liberty to expound the statute by equity, and only *quoad hoc* disregard it." 1 *Blackst. Comm.* (Lewis' Ed.), 91. An illustration given by this learned author is that if an act of Parliament gives a man power to try "all cases that arise within his manor of Dale," yet, if a case should arise in which he himself is a party, the act is construed not to extend to that, because it is unreasonable that any man should determine his own quarrel.

In *Hooper v. Creager,* 84 Md. 195, 35 A. 967, 971, 1103,

36 A. 359, wherein an act of Legislature was under consideration, the literal letter of which would have permitted the city council of Baltimore to commit the appointive power of officers of the city to a portion of its own body, or even to a stranger to the city administration, Judge McSherry, speaking for the court, said: "The bare possibility that such a result may flow from a judicial construction of a statute is sufficient to demonstrate the utter fallacy of the interpretation; especially when there is another and a different construction, which is far more reasonable, and which leads to no such serious consequences. A construction fraught with consequences so pernicious, as well as so dangerous to the order and good government of a great city, must be rejected, unless the plain, imperative words of the act of assembly are open to no other meaning at all."

Article 5 of the Maryland Declaration of Rights declares: "That the inhabitants of Maryland are entitled to the Common Law of England, and the trial by jury, according to the course of that law, and to the benefit of such of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six; and which by experience have been found applicable to their local and other circumstances, and have been introduced, used and practiced by the Courts of Law or Equity." In *State v. Buchanan,* 5 H. & J. 317, at page 358, it was said that this article of the Bill of Rights embraced and included the common law in mass, as it existed here, either potentially or practically, and as it prevailed in England at the time, except such portions of it as are inconsistent with the spirit of that instrument and the nature of our new political institutions. It is impossible to conceive that the maxims of the common law now under consideration, and which we are asked to apply, are inconsistent with or repugnant to the spirit and principles of republican institutions, whose strength lies in the virtue and integrity of the citizen to correct the morals and protect the reputation, rights, and property of individuals, by denying the right of a murderer to enrich himself by taking any part of his victim's estate.

Judge Phelps, in his work entitled Juridical Equity, under the general discussion of restrictive maxims, says: "All laws, as well as all contracts, may be controlled in their operation and effect by these general fundamental maxims of the common law, viz: No one shall be permitted to profit by his own fraud, to take advantage of his own wrong, to found any claim upon his own iniquity, or to acquire property by his own crime. If a legatee wilfully murders the testator, although no statute has enacted a forfeiture, these principles will prevent his reaping the fruit of his crime."

The English courts dealt with this question in *Cleaver v. Mut. Res. Fund Loan Assn.* (1892), 1 Q. B. 147. That was a case where a murder was committed and an action was brought under the policy of insurance by the executors of the murdered man; the beneficiary named in the policy being the murderess, his wife. It was a case of contract, but in the course of the opinion Lord Esher said: "No doubt there is a rule that if a contract be made contrary to public policy, or if the performance of a contract would be contrary to public policy, performance cannot be enforced either at law or in equity. If, in consequence of the death of the insured having been caused by the crime of a person in whose favor the policy is expressed to be made, or to or upon whom the policy money is left by will or settled, such person is not entitled to insist on its being paid to him, but he nevertheless claims the money from the executors, they may then vouch the doctrine of public policy, and say that by reason of it such person has forfeited his or her right to the money." Lord Justice Fry, in the same case, said: "The principle of public policy invoked is in my opinion rightly asserted. It appears to me that no system of jurisprudence can with reason include amongst the rights which it enforces rights directly resulting to the person asserting them from the crime of that person. If no action can arise from fraud, it seems impossible to suppose that it can arise from felony." And Lord Justice Lopes, in expressing his view, said: "I do not doubt that the principle of public policy would prevent the wife from recovering the amount of the policy money from

them and so reaping benefit from her crime; because no trust can be enforced which contravenes the law." That case was followed in the case of *In re Hall* (1914), Prob. 1, which was a case of manslaughter. The court there said: "It is said the *Cleaver* case was a case of murder and not manslaughter. I entirely fail to appreciate that distinction. It was a case of felony, and I see no reason to draw a distinction between murder and manslaughter in a case like this. The authority of *Cleaver v. Mut. Res. Fund Loan Assn.*, is sufficient for this court and is binding upon us, even if we felt any difficulty in following it, which I am bound to say I do not." In the *Crippen* case (1911), Prob. 108, it was declared: "It is clear that the law is that no person can obtain or enforce any rights resulting to him from his own crime; neither can his representative claiming under him obtain or enforce any such rights. The human mind revolts at the very idea that any other doctrine could be possible in our system of jurisprudence."

What appears to the earliest case in this country is that of *Riggs v. Palmer, supra,* decided by the Court of Appeals of New York, which involved the claim of a grandson as a legatee under the will of his grandfather whom he had murdered. This contention was denied. The court said: "It is quite true that statutes regulating the making, proof, and effect of wills and the devolution of property, if literally construed, and if their force and effect can in no way and under no circumstances be controlled or modified, give this property to the murderer. The purpose of those statutes was to enable testators to dispose of their estates to the objects of their bounty at death, and to carry into effect their final wishes legally expressed; and in considering and giving effect to them this purpose must be kept in view. It was the intention of the law-makers that the donees in a will should have the property given to them. But it never could have been their intention that a donee who murdered the testator to make the will operative should have any benefit under it. If such a case had been present to their minds, and it had been supposed necessary to make some provision of law to

meet it, it cannot be doubted that they would have provided for it. It is a familiar canon of construction that a thing which is within the intention of the makers of a statute is as much within the statute as if it were within the letter; and a thing which is within the letter of the statute is not within the statute unless it be within the intention of the makers. The writers of laws do not always express their intention perfectly, but either exceed it or fall short of it, so that judges are to collect it from probable or rational conjectures only, and this is called 'rational interpretation.' * * * 'The reason for such construction is that the law-makers could not set down every case in express terms. In order to form a right judgment whether a case be within the equity of a statute, it is a good way to suppose the law-maker present, and that you have asked him this question: Did you intend to comprehend this case? Then you must give yourself such answer as you imagine he, being an upright and reasonable man, would have given. If this be that he did mean to comprehend it, you may safely hold the case to be within the equity of the statute; for while you do no more than he would have done, you do not act contrary to the statute, but in conformity thereto,' * * * If the lawmakers could, as to this case, be consulted, would they say that they intended by their general language that the property of a testator or of an ancestor should pass to one who had taken his life for the express purpose of getting his property? * * * There was a statute in Bologna that whoever drew blood in the streets should be severely punished, and yet it was held not to apply to the case of a barber who opened a vein in the street. It is commanded in the decalogue that no work shall be done upon the Sabbath, and yet giving the command a rational interpretation founded upon its design the Infallible Judge held that it did not prohibit works of necessity, charity or benevolence on that day. What could be more unreasonable than to suppose that it was the legislative intention in the general laws passed for the orderly, peaceable, and just devolution of property that they should have operation in

favor of one who murdered his ancestor that he might speedily come into possession of his estate? Such an intention is inconceivable. * * * Besides, all laws, as well as all contracts, may be controlled in their operation and effect by general, fundamental maxims of the common law."

Applying the tests suggested in the above opinion to the present case, we would have now present the members of the Legislature which adopted our statute of descent and distribution, and there would be propounded to them the question: Did you intend to comprehend within the wording of the statute which you passed the case of a husband who murdered his wife, and therefore came within the literal letter of the statute? It is beyond belief that the answer would be in the affirmative. Neither is it conceivable that one be permitted by murder to acquire property through that act, which without the perpetration of the crime he might never come into possession of. If he had induced the delivery of it to him by fraud, under influence, or coercion, no one would deny that the application of the equitable maxims of the common law would and should prevent him from thus enriching himself. And yet we are here asked to adopt an interpretation of the statute which would enable him, by murder, to enjoy the fruits of his crime, which would be denied him if found to have perpetrated a fraud. This view finds vigorous support in an able and learned opinion in *Perry v. Strawbridge,* 209 Mo. 621, 108 S. W. 641, in the course of which it was said: "To our mind our statutes of descents and distributions are so largely expressive of the common law that we must consider these maxims and the whole body of the applicable common law doctrines; that we must read them together as parts and parcels of the same system, and when so read there can be but one answer to the query suggested by the facts of this case." In 1 *Kent's Commentaries* (14th Ed.), 464, that author says: "Statutes are likewise to be construed in reference to the principles of the common law; for it must not be presumed that the legislature intended to make any innovation upon the common law, further than the case absolutely required. This has been the language of the courts

in every age; and when we consider the constant, vehement and exalted eulogy which the ancient sages bestowed upon the common law as the perfection of reason, and the best birthright and the noblest inheritance of the subject, we cannot be surprised at the great sanction given to this rule of construction." In *Black on Interpretation of Laws,* p. 233, the author states: "No statute enters a field which was before entirely unoccupied. It either affirms, modifies or repeals some portion of the previously existing law. In order, there-fore, to form a correct estimate of its scope and effect, it is necessary to have a thorough understanding of the laws, both common and statutory, which heretofore were applicable to the same subject. Whether the statute affirms the rule of the common law upon the same subject, or whether it supplements it, supersedes it, or displaces it, the legislative enactment must be construed with reference to the common law; for in this way alone is it possible to reach a just appreciation of its purpose and effect. Again, the common law must be allowed to stand unaltered as far as is consistent with a reasonable interpretation of the new law."

In *Mut. Life Ins. Co. v. Armstrong,* 117 U. S. 591, 6 S. Ct. 877, 881, 29 L. Ed. 997, a case involving the collection of a policy of insurance upon the life of the deceased whom the beneficiary had murdered, the court said: "It would be a reproach to the jurisprudence of the country if one could recover insurance money payable on the death of the party whose life he had feloniously taken. As well might he recover insurance money upon a building that he had wilfully fired." In this illustration given by Mr. Justice Field, it may be answered that most fire insurance policies in terms contain a provision defeating recovery when the loss is occasioned by the wilful act of the insured. But if a policy should not contain such a provision, equity would prevent recovery by applying the common law maxim that no one shall be permitted to profit by his own fraud, or found any claim upon his own iniquity. Supporting the view expressed in *Riggs v. Palmer, supra,* and *Perry v. Strawbridge, supra,* are lucid and convincing opinions in the cases of *In re Tyler,*

140 Wash. 679, 250 P. 456; *Box v. Lanier, supra; Bryant v. Bryant,* 193 N. C. 372, 137 S. E. 188, which case, in effect, reverses the position formerly taken by that court in *Owens v. Owens,* 100 N. C. 240, 6 S. E. 794; *In re Wilkins,* 192 Wis. 111, 211 N. W. 652; *Lundy v. Lundy,* 24 Can. Sup. Ct. Rep. 650; *In re Medaini,* 38 Brit. Col. 319; *In re Cash,* 30 New Zeal. L. R. 577; *In re Mason,* 31 Dom. L. R. 305; *McKinon v. Lundy,* 24 Ont. Rep. 132. In *Re Medaini, supra,* the court said: "The English Courts have decided that a murderer can take nothing under the will of his victim. The decisions are based upon public policy. I can see no reason why the principle is not applicable to cases of intestacy. The reason assigned in some American decisions for refusing to deprive a murderer of benefits accruing to him under the intestacy of his victim, is that to do so would be to contravene the express provisions of the statutes of distribution. This reason would be equally valid in the case of a will, which also depends upon statute for its validity. There is nothing to make the Statute of Distribution more sacrosanct than the Wills Act." See *Slocum v. Metro. Life Ins. Co.,* 245 Mass. 565, 139 N. E. 816; *De Zotell v. Mut. Life Ins. Co.* (S. D.), 245 N. W. 58. Many other cases might be cited in support of the position that a beneficiary under a life insurance policy who murdered the assured is precluded from recovery. We think the principle applied in cases of that class is the same which we hold should be applied in the present case, for the reason that the common law equitable maxims must be taken into consideration and applied in the interpretation of statutes as well as contracts.

We are fully cognizant of the existence of high authority contrary to the view which we hold, and it would accomplish no beneficial purpose to take them up in detail and review the reasoning therein employed. It may be observed, however, that most, if not all, rest upon the argument that courts are powerless to read unambiguous words of the statute in conjunction with universally accepted moral and equitable principles without infringing the domain of legislative action, even though such interpretation result in sanctioning the

enrichment of the perpetrator of the most heinous murder from the estate of his victim. Suffice it to say that we decline to follow the reasoning supporting any interpretation fraught with consequences so pernicious and so abhorrent to the sense of justice, equity, and morality entertained by what we are pleased to believe is the overwhelming majority of thoughtful and moral people, but prefer to give expression and adherence to the principles and reasoning so forcibly presented by those courts who have in the past adopted the views herein expressed. It is abundantly apparent that these views are attracting new adherents whenever the question is now raised, as indicated by the law reviews, acts of legislatures, and the recent decisions of courts. Note article by Dean Ames of the Harvard Law School in *American Law Register and Review,* 1897; 29 *Mich. Law Rev.* 745 (1931); 6 *Univ. of Cincinnati Law Rev.* 469 (1932); 47 *Law Quarterly Rev.* 320 (1931); Lecture of Mr. Justice Cardozo at Yale Law School, 1921, "The Nature of Judicial Process," *Yale Univ. Press,* p. 40; *Virginia Law Rev.* (March, 1933), p. 518. Mr. Justice Cardozo states: "The directive force of logic does not always exert itself, however, along a single and unobstructed path. One principle or precedent, pushed to the limit of its logic, may point to one conclusion; another principle or precedent, followed with like logic, may point with equal certainty to another. In this conflict we must choose between the two paths, selecting one or other, or perhaps striking out a third, which will be the resultant of the two forces in combination, or will represent the mean between extremes." Using the case of *Riggs v. Palmer, supra,* as an illustration, he points out that: "Conflicting principles were there in competition for the mastery. One of them prevailed, and vanquished all the others. There was the principle of the binding force of a will disposing of the estate of a testator in conformity with law. That principle, pushed to the limit of its logic, seemed to uphold the title of the murderer. There was the principle that civil courts may not add to the pains and penalties of crimes. That, pushed to the limit of its logic, seemed again to uphold his title. But over

against these was another principle, of greater generality, its roots deeply fastened in universal sentiments of justice, the principle that no man should profit from his own iniquity or take advantage of his own wrong. The logic of this principle prevailed over the logic of the others." To make effective this principle, which it is said has its roots fastened more deeply even than the common law (*Broom's Legal Maxims* (9th Ed.), 197; *Coke's Littleton,* 148b; *Domat,* pt. 2, bk. 1; *Code Napoleon,* 727; *Mackelday's Roman Law,* 530, 550), the courts have adopted different theories; some that the act of the wrongdoer prevents the title from being acquired by him, either under the provisions of a will for his benefit, or the statutes of descent and distribution; while others take the position that the wrongdoer takes the bare naked legal title as trustee for the heirs or personal representatives of the victim. But in both cases they reach the result by the application of the public policy expressed in the equitable maxims of the common law. Illustrations may be given of the application of this policy in other situations. As an example, our divorce statute expressly makes adultery a cause for absolute divorce, and yet it has been consistently held that connivance or collusion will bar relief. Again, our statute punishing embezzlement makes no explicit declaration that one convicted of that crime must make restitution and return the property, yet no one can doubt that in a proper action the embezzler would be required to return the property embezzled, based upon the application of the principle of the common law that he will not be permitted to take advantage of his own wrong, or found any claim upon his own iniquity.

Our views herein expressed sustain the order of the orphans' court, and it will be affirmed.

*Order affirmed, with costs.*