811 A.2d 812

Margaret **BESSETTE, et al.,**

v.

**Benjamin B. WEITZ.**

**No. 1011, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Oct. 30, 2002.

Reconsideration Denied Jan. 2, 2003.

Argued before SHARER, THEODORE G. BLOOM, (Retired, specially assigned), and RAYMOND G. THIEME, JR. (Retired, specially assigned), JJ.

THEODORE G. BLOOM, Judge, Retired, Specially Assigned.

In a suit brought by appellee, Benjamin B. Weitz,[1] against Community Management Corporation of Maryland ("CMC") and appellants, Margaret Bessette, Arvind Shah, and Quantum Property Management Corporation ("Quantum"), the Circuit Court for Montgomery County entered judgment against appellants[2] in the amount of $887,829. In this appeal from that judgment, appellants present the following issues:

1. When defendants did not guarantee a note, and the jury found that defendants did not knowingly sign or agree to be bound by personal guarantees, is it error for the trial court to enter an inconsistent judgment against defendants for the amount due on the note plus attorneys fees?

2. Does a trial court err by submitting equitable claims to the jury over objection, by declining to make the findings required of common law equity courts, and by entering a judgment based on a claim of unjust enrich-

---

**1.** The suit was originally brought by Trust Company of America, which had been formed by Weitz for that purpose. During the proceedings, Weitz was substituted for the original plaintiff.

**2.** Prior to judgment, CMC filed a petition for Chapter 11 bankruptcy, whereupon the action was stayed as to that defendant.

ment when there was no evidence upon which the trial court could find that the defendants were unjustly enriched?

3. Are claims filed in 1998 and 1999 based on unwritten promises allegedly made and not performed in 1998 and 1992 barred by the three-year statute of limitations?

4. Does the statute of frauds bar vague and indefinite unwritten promises made in 1991 and 1992 to answer for the debt of another, for which draft written agreements were created but rejected by plaintiff, notwithstanding the statute of frauds?

5. Does a trial court err by entering judgment on alleged unwritten agreements that defendants promised to pay the promissory note of another, when there is no evidence that the maker ever defaulted under the terms of the note, when the trial court denied defendants the opportunity to prove the maker's legal and equitable defenses for nonpayment, when the holder of the note elected as his exclusive remedy to take stock pledged under a security agreement, and when the terms of the alleged oral agreements are so vague and indefinite that it is impossible to determine the full intention of the parties?

6. May a trial court award attorneys' fees in the absence of a statute or contract providing for attorneys' fees?

7. When a long-term management agreement provides for termination at the end of a calendar month only on mutual consent, and a declaration of interest filed among land records assures the continuation of the agent's management for the term of a governmental regulatory agreement, is it error for a trial court to grant summary judgment to an owner who unilaterally terminated the management agreement before the end of the term solely because the agent inserted "Month to Month" in a two-inch blank in a government form?

As cross-appellant, Weitz presents the following two issues:

1. Should the case be remanded when the trial court erred in denying part of the attorneys' fees incurred and paid by Weitz based solely on the fact that Weitz had two attorneys?

2. Where Weitz was entitled to attorneys' fees in the case in chief, is Weitz also entitled to attorneys' fees for this appeal?

For the reasons that follow, we shall reverse the judgment of the circuit court.

## FACTUAL SUMMARY

Appellee formed CMC in 1972 to manage various apartment properties. As of 1990, appellee owned all of the stock of CMC, which then managed fifteen properties. Eight of those properties were regulated by the United States Department of Housing and Urban Development ("HUD") and were owned by limited partnerships in which appellee was the managing partner.

In 1990, appellee decided to sell CMC. He discussed the sale with several large property management companies, but eventually agreed to sell it to two of CMC's employees, Margaret Bessette and Arvind Shah, who had been employed by CMC since 1978 and 1987 as Vice President and Comptroller, respectively. As part of that transaction, on 15 October 1991 the parties executed a Stock Redemption Agreement; a Promissory Note; a Loan, Collateral Pledge, and Security Agreement ("Security Agreement"); and two Employment Agreements, one for Shah and one for Bessette.

The Redemption Agreement provided for purchase of all of Weitz's stock by CMC for $1,100,000, with all that stock to be pledged as collateral security for the payment and performance of the Promissory Note. It also provided that the Promissory Note would be personally guaranteed by Bessette and Shah.

In the Promissory Note, CMC, the maker, promised to pay $1,100,000 to Weitz. The note incorporated by reference

provisions of all the other agreements concluded on that day. The note also provided, *inter alia:*

> Any of the following events shall constitute an event of default under this note ("Event of Default"):  (a) The failure of Maker to pay any of Maker's obligations hereunder within fifteen (15) days after the Maker receives written note that such payment is due and payable;  or (b) any default by Maker under the terms of the Loan and Security Agreement.

The Note further stated:

> In addition, if an Event of Default should occur, Maker hereby authorizes any attorney of any court of record to appear for Maker, and confess judgment against Maker, without prior notice or opportunity for prior hearing, in favor of the holder of the Note in and for an amount equal to the total of (a) the amount of the unpaid balance of the Note, together with accrued and unpaid interest thereon, (b) all collection costs then incurred, (c) costs of suit, and (d) attorney's fees, as aforesaid.

The Security Agreement named CMC as a Borrower and Weitz as Lender.   It provided, in part:

6. ***GENERAL COVENANTS OF BORROWERS.***   Borrower, from and after the date hereof, covenants and agree [sic] as follows:

L.   The Borrower shall not sell, dispose of, grant any option or security interest or otherwise pledge or encumber any of its assets without first obtaining the written consent of the Lender first had and obtained [sic].

\* \* \*

10. ***REMEDIES, ETC. CUMULATIVE.***   Each right, power and remedy of the Lender provided for in this Agreement or in the Note or in the Loan Documents or now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concur-

rent and shall be in addition to every other such right, power or remedy.

The Employment Agreements of both Bessette and Shah provided:

*Covenants of Employee.* Employee covenants, promises and agrees as follows:

b. Not, during the term of Employee's employment, to be interested in or engage, either directly or indirectly, in any manner, including, but not limited to, as principal, agent advisor or otherwise, in any business similar to or in competition, directly or indirectly, in any manner howsoever or whatsoever, with Employer's business. . . .

In 1990, HUD conducted an audit of CMC and the Partnerships. As a result of the audit, HUD officials advised CMC that it would not be permitted to manage any new HUD properties as long as CMC has any connection to Weitz. Instead, HUD officials recommended that appellants form a new corporation that would have no connection to Weitz.

In April 1992, Bessette and Shah incorporated Quantum, a management firm that, technically, competed with CMC. Bessette owned two-thirds and Shah owned one-third of the issued stock of both CMC and Quantum. Prior to incorporation, they had sought Weitz's permission to form Quantum, as required by the Redemption Agreement. Weitz orally agreed, on the condition that Bessette and Shah would be personally liable on the Promissory Note from CMC and that Quantum would "stand in the shoes of CMC" and be subject to the CMC's obligations under the Sales Agreement. After formation of Quantum, CMC stopped seeking new management contracts, and all new management business was obtained in the name of Quantum.

In late 1992, Weitz's attorney drafted a written agreement ("Draft Agreement"), formalizing previous oral agreements between Weitz, on one hand, and Bessette and Shah, on the other. It stated, in part, that the formation of Quantum would not be used to circumvent the intent of the CMC Sales Agreement.

Between 1992 and 1995, Weitz assisted appellants by allowing them to transfer management contracts to Quantum and designating CMC as the managing agent of one of the partnerships. Weitz also advised appellants on many aspects of the business.

In January 1995, appellants' attorneys revised the Draft Agreement to include a provision acknowledging personal guarantees of the Promissory Note by Shah and Bessette. The Draft Agreement, however, was then further revised, so that the final version, which was executed on 22 February 1995, no longer provided for those appellants' personal guarantee of the Promissory Note.

Thereafter, based on the absence of a personal guarantee, Weitz notified appellants and CMC that they were in default of the Redemption Agreement. Following that notice, in September 1997 Weitz filed a suit against CMC and appellants in the United States District Court for the District of Maryland. That suit was ultimately dismissed in 1998 for lack of diversity jurisdiction.

Within 30 days of the dismissal, Weitz, pursuant to Maryland Rule 2–101(b), caused a new suit, *Trustco. v. Bessette, et al.* (Case No. 190210) to be filed against Bessette, Shah, Quantum, and CMC in the Circuit Court for Montgomery County. Trustco. was a corporation created by Weitz, who was later substituted as a plaintiff in that litigation. The claims were for breach of contract and for a declaratory judgment. The breach of contract claim alleged that a default occurred when appellees Shah and Bessette founded Quantum, a competing business, thus impairing CMC's financial stability and, consequently, violating the terms of the Redemption Agreement. Another default was alleged to be appellants' failure to obtain Weitz's consent to the founding of Quantum.

### Case No. 186683

Weitz was a general partner of Jefferson House Associates Limited Partnership ("Jefferson"); Shenandoah Associates Limited Partnership ("Shenandoah"); Leesburg Manor Asso-

ciates Limited Partnership ("Leesburg"), and several other partnerships that owned various real properties in Maryland and Virginia.

Jefferson and Shenandoah had entered into Management Agreements with CMC on 16 November 1983 and 25 February 1982, respectively. By virtue of those agreements, CMC was appointed as an agent to lease, maintain, and operate the properties owned by Jefferson and Shenandoah. Paragraphs 26 and 28 of each agreement provided, *inter alia:*

*TERM OF AGREEMENT.* This Agreement shall remain in effect until canceled by HUD, the Owner or the Agent, subject, however, to the following conditions:

\* \* \*

b. This Agreement may be terminated by the mutual consent of the Principal Parties as of the end of any calendar month, provided that at least thirty (30) days advance written notice thereof is given to the Consenting Parties HUD and the mortgagee[ ]. . . .

As required by HUD, Shenandoah and CMC filed with HUD, on 1 September 1992, a "Management Certificate." An identical certificate was filed by Jefferson and CMC on 1 June 1993. Each of those management certificate forms contained, *inter alia,* the following certification language.

1. We certify that:

    a. We have executed or will execute, within 30 days after receiving the approval required by paragraph b below, a Management Agreement for this project. The agreement provides/will provide that the Management Agent will manage the project for the term and fee described below. Changes in the term or fee will be implemented only in accordance with HUD's requirements.

(1) Term of Agreement: MONTH TO MONTH

(2) Fees: (Then follows a detailed schedule of management fees.)

Previous certifications had described the term, *i.e.*, duration, of agreement "OPEN ENDED."

In January 1997, Jefferson unilaterally terminated its management agreement with CMC. Shenandoah unilaterally terminated its agreement with CMC in December 1997. In May 1998, CMC filed suit in the Circuit Court for Montgomery County against Weitz, his wife, his co-partners in real estate partnerships, Herbert Cohen, Donald Hudson, and Roy Scuderi, and the Jefferson, Shenandoah, and Leesburg Partnerships (*Community Management Corporation of Maryland v. Weitz, et al.*, Case No. 186683). That case was consolidated, on CMC's motion, with the case of *Weitz v. Bessette, et al.*, No. 190210, in August 1998. All of CMC's claims were later reasserted by CMC as counterclaims in appellee's suit against it.

In a related development, in 1998, some of the partnerships filed law suits in Virginia against CMC, Bessette, Shah, and Robert Pelton, a director of CMC. The partnerships successfully opposed CMC's October 1998 motion to enjoin the partnerships from prosecuting these claims in Virginia.

On 18 March 1999, the Circuit Court for Montgomery County granted appellee's motion to dismiss appellants' separate count against appellee for breach of the covenant of good faith and fair dealing because it held that such a cause of action did not exist on its own.

On 20 April 1999, the partnerships attempted to file counterclaims against CMC. The trial court granted CMC's motion to permit the partnerships to dismiss their Virginia litigation and consolidate all their claims in the Circuit Court for Montgomery County. The partnerships, however, elected to maintain the Virginia litigation, as a result of which their counterclaims against CMC were dropped from the Montgomery County case.

On 12 July 1999, Jefferson and Shenandoah moved for summary judgment on Counts VIII and IX of CMC's second amended complaint against them. Those counts were based on CMC's claim that the Partnerships, through Weitz and the

other general partners, had wrongfully terminated their management agreements with CMC. Jefferson and Shenandoah argued that the terminations were proper because the original management agreements with CMC had been amended by the Management Certifications which, in addition to increasing the percentage fee to be paid to CMC, also changed the term of the agreement to "Month to Month."

At a hearing on 27 October 1999, the circuit court granted the partnerships' summary judgment motions, stating, in relevant part:

The Court is satisfied upon considering argument, counsel, with respect to the motion of Shenandoah for summary judgment found at Tab 136, and at [sic] Jefferson House set out at Tab 138, that upon consideration of the arguments set out therein, there is no material dispute of fact, and the summary judgment shall be granted in both instances, and it shall be granted.

The court subsequently considered and denied CMC's motion to alter or amend the summary judgments entered for Shenandoah and Jefferson.

On 5 November 1999, during a continuation of the 27 October 1999 hearing, the circuit court granted additional summary judgments in favor of appellee against appellants on their claims against appellee for fraud and fraud in the inducement.

By Order of 21 January 2000, the circuit court dismissed the portion of Count XII of CMC's second amended complaint on which summary judgment had not yet been granted. It also ordered that Leesburg shall no longer be a party in this case, and that Weitz, Cohen, and Hudson shall no longer be parties to Count XII.

### Case No. 190210

In September 1998, CMC ceased making payments on the Promissory Note. In the summer of 1999, appellee's complaint was amended to add claims for fraudulent conveyance, unjust

enrichment, and promissory estoppel. As noted above, the court submitted the following special issues to the jury:

1. Do you find that Margaret P. Bessette and Arvind Shah knowingly signed and agreed to be bound by personal guarantees to Benjamin Weitz in the October 15, 1991 Stock Redemption Agreement?

   Answer: No.

2. Do you find that Benjamin Weitz reasonably relied upon clear promises of Margaret P. Bessette and Arvind Shah in selling CMC to them that they would execute guarantees?

   Answer: Yes.

3. Do you find that Benjamin Weitz conferred benefits upon Margaret P. Bessette and Arvind Shah and that allowing them to retain these benefits would be unjust?

   Answer: Yes.

4. If you answered "Yes" to Question 1, 2, or 3, what judgment do you enter in favor of Benjamin Weitz against Margaret P. Bessette and Arvind Shah jointly and severally?

   Answer: $581,484

5. Do you find that the parties orally agreed that Quantum would have the same obligations as CMC under the October 15, 1991 agreements?

   Answer: Yes.

6. Do you find that Benjamin Weitz reasonably relied upon clear promises of Margaret P. Bessette and Arvind Shah that by permitting them to establish Quantum, it would be subject to the same obligations as CMC under the October 15, 1991 agreements?

   Answer: Yes.

7. If you answered "Yes" to Question 5 or 6, what judgment do you enter in favor of Benjamin Weitz against Quantum Property Management Corporation?

   Answer: $581,484

8. Do you find by clear and convincing evidence that Benjamin Weitz fraudulently inserted the personal guarantee language in the 1991 Stock Redemption Agreement?

Answer: No.

On 17 April 2000, the trial court entered a judgment against appellants based on the jury verdict, to which the court added attorneys' fees of $306,345, for a judgment in the total amount of $887,829.

Bessette, Shah, and Quantum filed this appeal from the judgment entered on 17 April 2000. As noted above, CMC had filed a petition for bankruptcy on 17 February 2000; consequently, the circuit court at its February 2000 hearing stayed all proceedings against CMC. Quantum, Bessette, and Shah filed for bankruptcy in the summer of 2000, but their appeal was resumed when the stay of bankruptcy was lifted by the bankruptcy court in March 2001.

Additional facts will be included as necessary in the discussion that follows.

## DISCUSSION

### I.

Before considering the merits of the case, we must address appellee's motion, pursuant to Maryland Rule 8–603, to dismiss this appeal. For the reasons explained below, that motion is denied.

Appellee maintains that dismissal is warranted because appellants have committed five violations of the Maryland Rules of Procedure. Appellee alleges that appellees violated Rule 8–205 by failing to file a timely information report; that appellants violated Rule 8–411(C) by filing a trial transcript with the circuit court on 16 September 2001 instead of 16 July 2001, i.e., three months late; and that appellees violated Rule 8–502 by not timely filing a brief on the merits. The brief was due on 27 August 2001, but appellants did not file a motion for extension of time until 7 September 2001, ten days later.

Appellee further asserts that appellants violated Rule 8–501(d)(1) by failing to timely provide appellee with a statement of those portions of the record that appellants desired to include in the record extract. The statement was due by 31 July 2001, but was not served on appellee until 4 December 2001. Appellee further alleges that appellants violated Rule 8–114(b) by citing an unpublished opinion in their brief.

We note initially that, pursuant to Maryland Rule 8–602, only one of the alleged violations could be considered grounds for dismissal. Maryland Rule 8–602 provides, in relevant part:

**Rule 8–602. Dismissal by Court.**

(a) **Grounds.** On motion or on its own initiative, the Court may dismiss an appeal for any of the following reasons:

(1) the appeal is not allowed by these rules or other law;

(2) the appeal was not properly taken pursuant to Rule 8–201;

(3) the notice of appeal was not filed with the lower court within the time prescribed by Rule 8–202;

(4) an information report was not filed as required by Rule 8–205;

(5) the record was not transmitted within the time prescribed by Rule 8–412, unless the court finds that the failure to transmit the record was caused by the act or omission of a judge, a clerk of court, the court stenographer, or the appellee;

(6) the contents of the record do not comply with Rule 8–413;

(7) a brief or record extract was not filed by the appellant within the time prescribed by Rule 8–502;

(8) the style, contents, size, format, legibility, or method of reproduction of a brief, appendix, or record extract does not comply with Rule 8–112, 8–501, 8–503, or 8–504;

(9) the proper person was not substituted for the appellant pursuant to Rule 8–401; or

(10) the case has become moot.

■ It is immediately apparent that in this case only two of the alleged violations could serve as grounds for dismissal under Rule 8–602:(1) the violation of Rule 8–205 by failing to file a timely information report and (2) the violation of Rule 8–502 by the failure to file appellants' brief timely. On 19 July 2000, this Court dismissed the appeal *sua sponte* because of appellants' failure to file a Prehearing Information Report pursuant to Rule 8–205 on or before 7 July 2000. The appeal was later reinstated on appellants' motion for reconsideration.

■ Appellee fails to set forth any prejudice resulting to him from the above violations. He merely states, "Weitz has been prejudiced by the delays caused by appellants' failure to comply with the rules. . . . Appellants' repeated tactical delays and violations of the rules have significantly hindered the resolution of this appeal and have thwarted Weitz's ability to enforce the judgment."

We are not persuaded that the failure to file an information report timely and the ten-day delay in requesting an extension of time to file a brief were sufficiently prejudicial to the appellee to warrant dismissal of this appeal. *See Reed v. Baltimore Life Ins. Co.*, 127 Md.App. 536, 546–47, 733 A.2d 1106 (1999). Consequently, appellee's motion is denied.

## II.

We next address appellants' Motion for Order Pursuant to Rule 8–602(e)(1)(C). Appellants concede that all the claims by and against CMC in the case *sub judice* have not been finally adjudicated, and that there was no entry of final judgment. Nevertheless, they request "that this Court exercise its discretion under Rule 8–602(e)(1)(C) to direct that the April 17, 2000 judgment be deemed final. . . ." Appellee, on the other hand, asserts that all claims by and against CMC have been finally adjudicated.

For an appellate court to have subject matter jurisdiction, an appeal must generally be taken from a final judgment or an appealable interlocutory order. Md.Code (1974, 2002 Repl. Vol.) §§ 12–301 and 12–303 of the Cts. & Jud. Proc. Art. ("C.J."); *Harris v. Harris, P.A.,* 310 Md. 310, 314, 529 A.2d 356 (1987).

Maryland Rule 2–602(a) provides:

(a) **Generally.** Except as provided in section (b) of this Rule, an order or other form of decision, however designated, that adjudicates fewer than all of the claims in an action (whether raised by original claim, counterclaim, cross-claim, or third-party claim), or that adjudicates less than an entire claim, or that adjudicates the rights and liabilities of fewer than all the parties to their action:

(1) is not a final judgment;

(2) does not terminate the action as to any of the parties; and

(3) is subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties.

Section (b) of Rule 2–602, however, permits the court, if it expressly determines in a written order that there is no just reason for delay, to direct the entry of a final judgment:

(1) as to one or more but fewer than all claims or parties; or

(2) pursuant to Rule 2–501(e)(3), for some but less than all of the amount requested in a claim seeking money relief only.[3]

We find in the record before us no indication that any final judgment, adjudicating all claims as to all parties, was ever entered in Case No. 186683. There were summary judgments

---

**3.** Rule 2–501(e)(3) permits a court to grant summary judgment "for some but less than all of the amount requested when the claim for relief is for money only and the court reserves disposition of the balance of the amount requested." Rule 2–602(b)(2) permits the court to direct that such a partial judgment be entered as a final judgment.

against the plaintiff, CMC, in favor of some defendants on some claims. Those summary judgments, therefore, are merely interlocutory judgments, which are subject to being stricken out or modified at any time before a final judgment is entered. Rule 2–602(a)(3); *Associated Realty Co. v. Kimmelman,* 19 Md.App. 368, 374, 311 A.2d 464 (1973).

Despite the consolidation of Case Nos. 186683 and 190210 for trial, the absence of a final judgment in Case No. 186683 would not prevent the entry of a final judgment in Case No. 190210. *See Yarema v. Exxon Corp.,* 305 Md. 219, 235–240, 503 A.2d 239 (1986) (holding that, when two or more cases are consolidated for trial, there must be a separate judgment in each case, and the lack of a final judgment in one case will not affect the finality of judgments in the consolidated case or cases).

The absence of a judgment against CMC in this case, No. 190210, would itself prevent the judgment entered herein from being final and appealable. *Gindes v. Khan,* 346 Md. 143, 150, 695 A.2d 163 (1997); *Starfish Condo. Ass'n. v. Yorkridge Serv. Corp.,* 292 Md. 557, 562–66, 440 A.2d 373 (1982). The automatic stay of proceedings against the bankrupt, pursuant to Bankruptcy Rule 401(a), was not the equivalent of a dismissal of the bankrupt defendant from the case. *Gindes,* 346 Md. at 150, 695 A.2d 163. If one of several defendants in an action files for bankruptcy while the action is still pending, the circuit court may, pursuant to Rule 2–602(b), render a judgment and direct that it be entered as a final judgment. *Id.*

After the *Starfish Condominium* decision, the Court of Appeals adopted Maryland Rule 8–602(e)(1), "under which 'the appellate court may, as it finds appropriate, ... (C) enter a final judgment on its own initiation in cases in which the lower court had discretion to direct the entry of a final judgment pursuant to Rule 2–602(b).' " *Gindes,* 346 Md. at 150–51, 695 A.2d 163. Appellants have requested us to enter a final judgment pursuant to Rule 8–602(e)(1)(C) so that this appeal can be considered. Finding no just reason to delay the appeal process, particularly in view of our conclusions as to the merits

of the appeal, we shall grant appellant's request. Accordingly, we hereby enter a final judgment in this case in accordance with Rule 2–602(e)(1)(C), treating the appeal as timely filed in accordance with section (e)(3) of Rule 8–602.

## III.

We shall not address all of the issues raised by the parties. Basically, our decision will respond to appellants' seventh issue. We shall, however, briefly discuss other issues that may arise again during a new trial.

1. We restate appellants' seventh issue as follows:

Did the trial court err in precluding appellants from presenting evidence in support of a defense of estoppel based on Weitz's conduct in causing partnerships to terminate their contracts with CMC, thereby making it impossible for CMC to pay the promissory note to Weitz?

That question, in turn, raises sub issues:

A. Is a defense that might be raised by CMC available to appellants?

B. What is the effect of the summary judgment against CMC in Case No. 186683 on appellant's ability to assert CMC's defense?

C. Would there have been any merit in the defense that appellants wanted to present?

The special issues submitted to the jury were based on three possible theories for recovery of damages by Weitz:

1. That Bessette and Shah were guarantors of CMC's obligations under the October 1991 agreements, particularly the debt evidenced by CMC's cognivit note for $1,100,000.

2. That Bessette and Shah were unjustly enriched by their acquisition of CMC and their failure to do what they promised to do in consideration for that acquisition.

3. That Bessette and Shah orally agreed (a) to guarantee CMC's obligations to Weitz and (b) that Quantum would bear the same obligations to Weitz that CMC had under

the October 1991 agreements, and that Weitz reasonably relied upon those promises.

Appellants contend that the judgment is inconsistent because it was entered against them as if they were guarantors, even though the jury, in answering issue No. 1, found that they had not knowingly signed and agreed to be bound by personal guarantees to Weitz in the October 1991 Stock Redemption Agreement. That finding merely precluded recovery on the theory that Bessette and Shah were guarantors, because the Statute of Frauds provides that no action may be brought on a promise to answer for the debt or default of another unless it is in writing and signed by the party to be charged. C.J. § 5–901(1). It did not preclude an action for detrimental reliance, sometimes referred to as promissory estoppel.

In *Pavel Enters. v. A.S. Johnson Co., Inc.*, 342 Md. 143, 674 A.2d 521 (1996), the Court of Appeals stated that it had decided cases based on detrimental reliance as early as 1854, and that the general contours of the doctrine are well understood by Maryland courts. *Id.* at 164, 674 A.2d 521. The Court noted that there was some confusion as to whether Maryland would continue to adhere to the more stringent formulation of promissory estoppel, as set forth in the original Restatement of Contracts, or would now follow the more flexible view found in the Restatement (Second) of Contracts. To resolve that confusion, the Court then clarified that "Maryland courts are to apply the test of the Restatement (Second) of Contracts § 90(1) (1979)," which the Court then recast as the following four part test:

1. a clear and definite promise;

2. where the promisor has a reasonable expectation that the offer will induce action or forebearance on that part of the promisee;

3. which does induce actual and reasonable action or forbearance by the promisee; and

4. causes a detriment which can only be avoided by the enforcement of the premises.

*Pavel,* 342 Md. at 166, 674 A.2d 521.

The effect of the jury's response to verdict issue No. 3 was the establishment of appellants' liability to Weitz as guarantors despite the absence of a written guarantee that would satisfy the Statute of Frauds. The jury's response to verdict issue No. 2 established liability of appellants Bessette and Shah on a different theory, that of unjust enrichment, and the verdict in response to issue No. 4 established the extent of those appellants' liability at $581,484, the amount then due as principal and interest on CMC's note. It is clear that the judgment entered by the court was on the theory of detrimental reliance rather than the theory of unjust enrichment: (a) it was against all three appellants, whereas only two of them were found to have been unjustly enriched; (b) it was for the amount due by the principal debtor on its promissory note; and (c) it included an award of attorneys' fees, which could only have been awarded on the basis that CMC's note authorized an award of attorneys' fees. Under the American system, courts can award attorneys' fees only if authorized by contract, statute, or rule. *Blitz v. Beth Isaac Adas Israel Congregation,* 115 Md.App. 460, 476, 694 A.2d 107 (1997).

Appellants' major complaint is that the court erred in preventing them from introducing evidence that the reason CMC defaulted on the note was that Weitz had wrongfully caused partnerships to breach (unilaterally terminate) management contracts with CMC. In response, Weitz argues: (1) the summary judgments against CMC in Case No. 186683 were based on a determination that the partnerships were legally entitled to terminate the contracts, and (2) that appellants had no standing to challenge those rulings, which were not appealed and which were made in a case in which appellants were not parties.

Our answer to the first part of Weitz's argument is that the rulings of the trial judge, based solely on the prior grants of summary judgment by the judge who had earlier presided

over the proceedings in Case No. 186683, were erroneous, and that the earlier grants of summary judgment against CMC were also erroneous.

■ The trial judge apparently concluded that she was bound by the prior grants of summary judgments. She referred to those judgments and the basis for them as "the law of the case." She concluded, therefore, that, because those judgments were based on a determination by the judge who granted them that the partnerships that terminated the management contracts had the legal right to do so, appellants were barred from presenting evidence to the contrary and could not present a defense based upon their contention that the contracts were wrongfully cancelled. As we have pointed out above, there was and is no final judgment in Case No. 186683 because not all claims as to all parties have been resolved. Therefore, the summary judgments against CMC in that case are interlocutory judgments only and, as such, are "subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties." Rule 2–602(a). Under no interpretation of the Law of the Case doctrine, therefore, could those interlocutory summary judgments have been binding on the trial court.

■ Moreover, the court had erred in granting the summary judgments in Case No. 186683. The record reflects that the court's conclusion that the Jefferson and Shenandoah partnerships had a legal right to terminate their contracts with CMC was based on the HUD Certifications filed for those partnerships' properties. As noted above, each of those certifications described the term of the owner's agency contract with CMC as "month to month." The court accepted the partnerships' contention that, in exchange for increased management fees, CMC agreed to modify its existing contracts with Jefferson and Shenandoah to make them subject to cancellation by either party on one month's notice. Generally, "month to month" in leases and other contracts means that *either* party can terminate the contract upon one month's notice. Appellants maintained that the usual meaning of this

term, as used in the HUD Certifications, was not the intent of the parties, at least not the intent of CMC. As set forth above, the contracts between CMC and Jefferson and CMC and Shenandoah specifically provide that they were of indefinite duration, but could be cancelled by HUD or the contracting parties, subject to the condition that each could be terminated *by mutual consent* at the end of any calendar month with 30 days' written notice to HUD and mortgagees. "Month to month" in the HUD certifications, therefore, was an ambiguous term. It could have been intended to have its usual meaning—subject to termination by either party—as Weitz and the partnerships contended—or it could have been intended to describe the then existing contracts, which were of indefinite duration but could be cancelled at the end of any calendar month *by mutual consent.* What the parties intended those words inserted in the HUD Certifications to mean—a change from the contract provision requiring mutual consent to terminate the contract, or merely an abbreviated description of the existing terms of the contracts—is for the jury to determine, not for a judge to decide as a matter of law. Summary judgment is only appropriate if there is no dispute of any material facts. Md. Rule 2–501(a). It is not appropriate when, as in this case, the intended meaning of a three-word phrase inserted in a blank space in a government document is in dispute. *See Board of Educ. of Charles County v. Plymouth Rubber Co.,* 82 Md.App. 9, 24–27, 569 A.2d 1288 (1990) (finding summary judgment improper because warranty provision was ambiguous).

■ There is no merit in Weitz's contention that appellants have no standing to challenge rulings that prevented CMC from asserting a defense of equitable estoppel to Weitz's claims. It is immaterial that appellants were not parties in Case No. 186683, in which summary judgments against CMC were granted, or that CMC never appealed from those judgments.[4] Appellants' liability to Weitz was predicated on the

---

4. The summary judgments against CMC could not have been appealed because there was no final judgment in Case No. 186683.

doctrine of detrimental reliance on oral promises to guaranty the obligation of CMC to Weitz (Bessette and Shah) or to have the same obligations as CMC under the October 15, 1991 agreements (Quantum). Appellants, therefore, are held to their oral promises to be bound by, *i.e.*, guaranty, CMC's obligations to Weitz.

It has been repeatedly observed that, as a general rule, a guarantor "possesses all the defenses available" to the principal debtor. *McChord Credit Union v. Parrish*, 61 Wash.App. 8, 809 P.2d 759, 762 (1991) (citing A. Sterns, THE LAW OF SURETYSHIP (5th Ed.1951), § 71 at page 200). *See also* Peter A. Alces, THE LAW OF SURETYSHIP AND GUARANTY, § 701[3]; *Metter Banking Co. v. Millen Lumber & Supply Co., Inc.*, 191 Ga.App. 634, 382 S.E.2d 624, 629 (1989). In *Provident Bank of Maryland v. Travelers Prop. Cas. Corp.*, 236 F.3d 138 (4th Cir.2000), Judge Niemeyer distinguished letters of credit from guarantee contracts, "in which, by contrast, the guarantor is only secondarily liable and therefore may assert any defense against the creditor's claim for payment that the primary debtor would have asserted." 236 F.3d at 147.

That principle and the reasoning behind it are set forth in the RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY, § 34 (1996):

**When Defenses of Principal Obligor May Be Raised by Secondary Obligor as Defenses to Secondary Obligation**

(1) Except as provided in subsection (3) the secondary obligor may raise as a defense to the secondary obligation any defense of the principal obligor to the underlying obligation except:

   (a) discharge of the underlying obligation in bankruptcy proceedings;

   (b) unenforceability of the underlying obligation due to the principal obligor's lack of capacity.

The reason for this general rule is set forth in the following comment:

a. **Defenses.** The purpose of the secondary obligation is to stand behind the obligation of the principal obligor to perform the underlying obligation, thereby assuring the obligee of the performance to which it is entitled. It is not the purpose of the secondary obligation to assure the obligee of performance to which it is not entitled pursuant to its contract with the principal obligor. Thus, to the extent that the principal obligor can raise a defense to its duty pursuant to the underlying obligation, the secondary obligor should be able to raise that defense to its secondary obligation; this is so even if the principal obligor chooses not to raise that defense. There are two exceptions to this principle. First, the secondary obligor is free to contract to be liable on the secondary obligation even when the principal obligor has a defense to the underlying obligation. Second, there are two possible defenses of the principal obligor—discharge in insolvency proceedings and lack of capacity—against which the secondary obligation is designed to protect. Thus, these defenses may not be raised by the secondary obligor.

(Internal citation omitted.)

We hold, therefore, that appellants were entitled to raise as a defense to Weitz's claims against them any defense that would have been available to CMC, despite (1) the summary judgments entered against CMC in Case No. 186683 and (2) the fact that appellants were not parties in that case.

We turn now to the question of whether the evidence that appellants sought to introduce—that Weitz wrongfully caused partnerships of which he was the managing general partner to breach (unilaterally cancel) their management contracts with CMC, and that such breaches caused CMC to default on its note to Weitz—would have constituted a defense to their secondary obligations. If not, then the court's error in denying appellants the opportunity to present such evidence would have been harmless.

Appellant's proposed defense was that of equitable estoppel, which is defined in 3 J. POMEROY, A TREATISE ON EQUITY JURISPRUDENCE § 804 (Spencer W. Symons ed., 5th ed.1941) as follows:

Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

In *Knill v. Knill,* 306 Md. 527, 534, 510 A.2d 546 (1986), the Court of Appeals quoted the foregoing passage from Pomeroy, stating that it had been consistently applied in Maryland as the definition of equitable estoppel. *Knill,* in turn, together with its quotation from Pomeroy, was recently quoted in *Cunninghame v. Cunninghame,* 364 Md. 266, 289, 772 A.2d 1188 (2001).

In most instances, equitable estoppel, or *estoppel in pais,* arises when one party, relying in good faith on the conduct of another, was thereby led to change his position for the worse. Therefore, the elements of estoppel are usually described, as stated by Judge Deborah Eyler, writing for this Court in *The Catholic Univ. of Am. v. Bragunier Masonry Contractors, Inc.,* 139 Md.App. 277, 305, 775 A.2d 458 (2001), *aff'd* 368 Md. 608, 796 A.2d 744 (2002), as follows:

(1) [V]oluntary conduct or a representation by the party to be estopped, even if there is no intent to mislead; (2) reliance by the estopping party; and (3) detriment to the estopping party.

(Citations omitted.)

There may be instances, however, of equitable estoppel based solely on conduct by one party that makes it inequitable and unconscionable to allow him to assert rights and claims against another party, without the necessity of

reliance by the second party. In *The J.F. Johnson Lumber Co. v. Magruder*, 218 Md. 440, 147 A.2d 208 (1958), Judge (later Chief Judge) Prescott, writing for the Court of Appeals, added the following to Pomeroy's explanation of equitable estoppel:

> The whole doctrine of equitable estoppel is a creature of equity and governed by equitable principles. It was educed to prevent the unconscientious and inequitable assertion of rights or enforcement of claims which might have existed or been enforceable, had not the conduct of a party, including his spoken and written words, his positive acts and his silence or negative omission to do anything, rendered it inequitable and unconscionable to allow the rights or claims to be asserted or enforced.

218 Md. at 447–48, 147 A.2d 208.

The foregoing language is consistent with "the ancient maxim that no one should profit from his own conscious wrong." *Chandlee v. Shockley*, 219 Md. 493, 150 A.2d 438 (1959) (quoting *Scarborough v. Atlantic Coast Line R. Co.*, 178 F.2d 253 (C.A.4th.1949), *cert. denied* 339 U.S. 919, 70 S.Ct. 621, 94 L.Ed. 1343 (1950)). That principle was applied in *Price v. Hitaffer*, 164 Md. 505, 511–13, 165 A. 470 (1933), and later in *Chase v. Jenifer*, 219 Md. 564, 150 A.2d 251 (1959).

We believe that the evidence that the court erroneously prevented appellants from introducing could have established a defense to Weitz's claims against them. Consequently, the error was not harmless, and we must, therefore, reverse the judgment appealed from.

In the course of our discussion, we have, in effect, answered most of the issues presented by the parties. We shall respond to two more issues because they may arise again on retrial:

a. Appellants' third issue, concerning the statute of limitations.

b. Cross-appellant Weitz's first issue, concerning denial of a part of the attorneys' fees that he incurred.

Appellants contend that Weitz's case against them is barred by the three-year statute of limitations, C.J. § 5–101,

because their alleged promises to become secondarily liable for CMC's obligation to Weitz preceded this suit by more than three years. That contention is meritless for two reasons: (a) CMC's promissory note to Weitz was under seal and, therefore, subject to the twelve year statute of limitations (C.J. § 5–102(a)(1)); (b) liability of a secondary obligor does not occur when the secondary obligation is contracted, but when the primary obligor defaults.

Weitz complains that the court arbitrarily refused to award all the counsel fees his attorneys requested "based solely on the fact that he was represented by two attorneys." He argues that the court failed to make an independent analysis of whether the total fees were reasonable, regardless of the number of attorneys.

Weitz's attorneys filed a request for attorneys' fees, accompanied by supporting documents—bills and time records—approximately three inches thick. The court, "[h]aving considered the evidence and arguments presented and the entire record of this case," awarded attorneys' fees and costs in the amount of $306,345. That amount represented "the legal fees and costs billed to Weitz by the law firm Lerch, Early & Brewer, Chartered (LEB), for representation in this litigation and costs personally expended by Weitz, minus the legal fees and costs incurred by Weitz" in litigation in a federal district court action that was ultimately dismissed. The court declined to award legal fees and costs incurred by the various partnerships, and it also declined to award Weitz the cost of representation in this case by a second attorney at trial.

On its face, an award of counsel fees in the amount of $306,345 incurred in an action to recover $581,484 in principal and interest on a promissory note seems to be excessive. The court apparently awarded the total amount of fees and costs charged by Lerch, Early & Brewer for services rendered in this case. We can only assume, in the absence of any indication to the contrary, that the amount of hours spent and the mass of paperwork generated by that law firm were found by the court to be reasonable. We are in no position to reach a

contrary conclusion. Nor are we in any position to disagree with the court's conclusion that the presence of a second attorney at trial was not necessary and, therefore, that it would not be reasonable to require appellants to pay the fees charged by that attorney.

**JUDGMENT REVERSED.**

**COSTS TO BE PAID BY APPELLEE–CROSS APPEL- LANT BENJAMIN B. WEITZ.**